## Commonwealth *v.* Fugmann, Appellant.

Argued November 29, 1937. Before SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

Indictment for murder. Before SHULL, P. J., specially presiding.

The opinion of the Supreme Court states the facts.

Verdict of guilty, with penalty of death, and judgment and sentence thereon. Defendant appealed.

*Errors assigned,* among others, were various rulings on evidence.

*Henry Thalenfeld,* with him *E. F. McGovern,* for appellant.

*Leon Schwartz,* District Attorney, with him *Frank Slattery, Jr.,* Assistant District Attorney, for appellee.

OPINION BY MR. JUSTICE MAXEY, March 21, 1938:

This is an appeal from the sentence of death imposed upon the defendant, Michael Fugmann, after he was convicted of murder in the first degree upon an indictment charging him with the killing of Thomas Maloney, Sr.

On the morning of April 10, 1936 (Good Friday), Thomas Maloney, a labor leader of Luzerne County, received from a United States mail carrier a package wrapped in brown wrapping paper. His name and address were printed upon it and in the upper left-hand corner were printed the words "Sample H 14 W.B." Maloney, in the presence of his daughter Margaret, aged 16 years, and son Thomas, Jr., aged 4 years, removed the wrapper of the package in the kitchen of his home in Wilkes-Barre Township and revealed the box. On prying open the lid of the box a violent explosion took place, which tore off his arm, blinded him, riddled his body with fragments of wood, paper and bits of metal. The explosion also severely injured the daughter and son above mentioned. Both Thomas Maloney, Sr., and Thomas Maloney, Jr., died as the result of the injuries so sustained. Maloney's wife testified that her husband immediately after the explosion said, "Fugmann done this." The admission in evidence of this declaration is the basis for the first assignment of error.

There were delivered through the mail on the same day five other bombs addressed to each of the following: Judge Benjamin R. Jones, a member of the Court of Common Pleas of Luzerne County, Luther Kniffen, a former sheriff of that county, Harry Gouldstone, a mine superintendent, James Gorman, Anthracite mine umpire, and Michael Gallagher. The bombs addressed to Judge JONES and Mr. Gorman were intercepted in the mails before delivery. The other three were delivered. The one sent to Mr. Kniffen was by chance opened in such a way that no detonation took place; the police intercepted the one sent to Mr. Gouldstone after it had been delivered to his home. Michael Gallagher was also killed by an explosion of a bomb when he opened the box addressed to him. All the bombs were wrapped in brown wrapping paper which a government expert testified as being identical (excluding the Gallagher wrapper of which no remnant was available for comparison).

Defendant was arrested on July 1, 1936, and taken to the Wyoming Barracks of the State Police, where he was kept until a preliminary hearing was given him on the afternoon of July 7th. During his detention at the barracks, police officers made several searches of defendant's home where some materials were found which the Commonwealth introduced in evidence for the purpose of identifying the defendant as the bombs' manufacturer.

The Commonwealth introduced evidence to show that the six bombs were deposited in United States mail boxes in the central part of the City of Wilkes-Barre, two each in different boxes, sometime between 4:30 and 9:45 p. m., on April 9, 1936. Each package was wrapped in a similar manner with brown wrapping paper and each bore, in the space usually employed for the return address, the pencil-printed symbol, "Sample H. 14 W.B." Defendant's handwriting experts agreed that the handwriting on the packages indicated beyond question that the same person printed them all.

Defendant admitted that he secured a number of cigar boxes from two Schulte Cigar Stores in Wilkes-Barre about three to six weeks before the bombing; he claimed that he placed them in his car and that they were stolen from it when he parked it to go to the Osterhout Library in that city. He asserted that he wished to use these boxes as containers for small tools he had at home. The cigar box sent to Judge Jones was a "Seidenburg" and it contained on the bottom a number assigned exclusively by the manufacturers to boxes of cigars which were sent to the Schulte Warehouse for distribution to Schulte Stores. Likewise, the box sent to Gorman contained a carton number 56698, which was used in fifty instances by the Phillies Bayuk Manufacturer in sending boxes of cigars to the Schulte Warehouse in New York. Also, the Schulte Stores in Wilkes-Barre had a stamp in which they designated the months when they received their stock by the first twelve letters of the alphabet, representing the twelve months consecutively, the second symbol of the stamp being a figure representing the last figure in the year they were received. The "Harvester" box when received by Kniffen had a "C 6" stamped upon it, which was obliterated by processing, and the box addressed to James Gorman had, at the time it was introduced in evidence, the mark "C 6" still upon it. "C 6" indicated that the goods were received by the Schulte Stores in Wilkes-Barre in March, 1936.

Edward Warden, a Schulte Cigar Store Manager, identified Fugmann as the man to whom he gave upon request "from three to five" cigar boxes on March 20, three weeks before the murders. Defendant admitted on cross-examination that he also obtained a "couple of cigar boxes" from a second Schulte Store in Wilkes-Barre, as well as "two or three" from Warden.

Although defendant claimed that he was a friend of the victims and intended victims and although there was a widely-publicized search for information as to any

persons who had obtained cigar boxes from any source in or about Wilkes-Barre, Fugmann did not notify the police that five or six cigar boxes had been stolen from his car, as he, *after being arrested,* claimed they had been. However, he stated to the police at the Barracks on July 2nd that upon reading in the newspaper that one Joe Danowski, alias "Big Joe," had committed suicide, he had told his wife that "Big Joe" was the man who had been near his [Fugmann's] parked car when the cigar boxes were stolen from it. The police thereupon went to Fugmann's home to check this assertion, and Mrs. Fugmann said that her husband had made no statement to her about stolen cigar boxes. On the witness stand she attempted to justify this discrediting of her husband's statement to the police, by declaring that she "had the right to lie in her own home."

The Commonwealth also showed that Fugmann stated that while attending the funeral of Thomas Maloney, Jr. (who had died three weeks after the explosion), he left the funeral line to get a cigar box. As to this, the district attorney says: "With the entire valley and every police agency in northeastern Pennsylvania engaged in a canvass to elicit information concerning persons who might have gotten cigar boxes, he went in search of one at a time when the victim of a cigar box bombing was being buried, and he testified that he got one." Where he got it he did not say. He claimed that this cigar box also was then stolen from his car during the funeral. He told a Mrs. Kennedy at the cemetery, on the day of the Maloney boy's funeral, that he had a cigar box stolen from his car. The Commonwealth argues that all this was for the purpose of preparing "an alibi knowing that the police were making a complete search for persons who might have received cigar boxes and that he might have been remembered by the clerk in Schulte's as receiving one or more boxes and he might thus later produce her as a witness to the fact that he had even before his arrest mentioned to someone that a

cigar box was missing from his car. His complete collapse, under cross-examination, as to this feature of the case robbed him of that alibi, as did also the fact that Mrs. Kennedy reported the fact to the police before his arrest."

In 1933 and 1934 Maloney and Fugmann had been actively associated in a mine workers "seceding" union, which by 1936 had become defunct. As a motive for Maloney's murder, the Commonwealth offered evidence that Fugmann's former friendship for Maloney had been superseded by enmity, this arising in part from the fact that Fugmann had been unable to collect four hundred and sixty-five dollars owing to him (or his wife) by Maloney.

Defendant testified as to his whereabouts on the afternoon and evening of April 9th, during which time the bombs had been placed in the mail boxes. He asserted that he was at home during the afternoon and evening until 7 o'clock, when he drove his wife and daughter to church on South Main Street, Wilkes-Barre. After leaving them at the church at about 7:15 p. m., he said that he drove to the library, parked his car in front of it, went into the library to return some books and read until 7:50 or 7:55 p. m., and then returned to church with his car for his wife and daughter. He said that he had to wait several minutes until 8 o'clock before the services were finished, when all three returned to their home, and that he did not leave his home during the remainder of the evening. Defendant's wife and daughter and the minister of the church corroborated him as to the time of the services and the presence there of Mrs. Fugmann and her daughter. Defendant denied that he was at or near the vicinity of the receptacles in which the bombs were mailed.

The unexploded bombs, together with a model bomb, purporting to be an exact copy of them (with the exception that the model had a glass lid to facilitate inspection of its "workings"), were put in evidence. The

death-dealing box was divided into three compartments. In the right-hand compartment there was a flashlight battery glued to some small pieces of wood which in turn had been glued to the bottom of the box. A wire was attached to the battery and extended to a detonator placed in or near a stick of dynamite resting in the center compartment. There was also a quantity of loose powder or dynamite in the center compartment. In the left-hand compartment were portions of a newspaper. A piece of copper wire was glued to the inside of the lid of the box and was so arranged that when the lid was lifted slightly the wire near the battery would make contact with the latter, set off a spark which would be carried to the detonator, and thus cause an explosion.

A search of defendant's home revealed, inter alia, the following: (1) a small quantity of dynamite in a ruined condition; (2) some glue on a kitchen chair and on a small piece of copper wire; (3) two pieces of Southern yellow pine wood; (4) some small nails and brads in a nail box and some extracted from old work shoes used by defendant; (5) some brown wrapping paper; (6) a small flashlight with two batteries in it, and (7) several feet of copper wire.

Commonwealth's expert witnesses testified that in their opinion both the dynamite found in the cellar and in the cigar boxes was "Monobel No. 8," a Du Pont product. The explosive power of the bombs consisted of two kinds of "Monobel No. 8," one being the "sprayed end," manufactured by the Du Pont Company after March 14, 1935, and the other the "unsprayed end," manufactured by it before that date. Two cartridges of "Monobel No. 8" "sprayed end" dynamite, i. e., the type manufactured after March 14, 1935, were found concealed in the coalbin of defendant's cellar and six inches under a water pipe thereof. He denied knowledge of its existence. This type powder was exclusively used in Inman Shaft where he worked. The Commonwealth contends that the date of the manufacture of

the dynamite is significant because the type found in defendant's cellar had not yet been created previous to his occupancy of that house.

The Commonwealth called expert witnesses whose testimony (hereinafter discussed) gave rise to inferences that the *glue,* the *wood* and the *nails* used in the construction of the bombs had been in defendant's possession.

Two flashlight batteries were found in defendant's home and put in evidence. Copper wire was found in his cellar; he claimed this was used for tying bags of coal picked by him.

The printing of the names and addresses on the paper which wrapped the bombs and the printing on the "handwriting standard" made by the defendant, bore resemblances so close that a layman examining them would be warranted in reaching the conclusion as to the identity of authorship which the Commonwealth's handwriting experts reached. Two witnesses who were called by the defense and who qualified as handwriting experts denied the identity of authorship between the questioned and admitted printing.

The jury found defendant guilty of murder in the first degree and fixed his punishment at death. Defendant's motion for a new trial was overruled by the court in banc. Then followed the sentence now appealed from.

There are seven assignments of error.

The first assignment is based on the overruling of defendant's objection to Mrs. Maloney's testimony that immediately after the explosion she asked her husband what had happened and he answered: "Fugmann done this." The objection to the offer of this testimony was on the ground that Maloney "didn't see Fugmann there, and what he said was only a matter of conjecture on his part." The court said: "This objection is overruled because the statement was made so soon after the explosion as to be a part of the general events, and to exclude any presumption that the statement resulted from pre-

meditation or design. It was clearly made at a very short interval after the explosion, the time being that required by Mrs. Maloney to come down-stairs, where the kitchen was found filled with dust and smoke to the extent that to find Thomas Maloney she got on her hands and knees and crawled along the floor. It is admitted only as it relates to proof of the general event, and not as any measure of proof of the guilt or innocence of defendant."

In his charge the trial judge said: "The expression 'Fugmann done this' is no proof whatever that this defendant perpetrated this crime. . . . It was admitted . . . in establishing . . . the corpus delicti. . . . It has absolutely no value to prove anything as to the guilt of Michael Fugmann. The District Attorney in presenting his case to you made no reference to it. . . . It is evidence only of exactly what took place at the time of this explosion. It is a part of the res gestæ; that is, the thing that the crime grows out of. . . . It is what we call a spontaneous expression, not the result of thought, . . . and its probative value is to show you just what happened in the Maloney home, and if this defendant is to be found guilty, . . . it must be exclusively on the other evidence in this case."

Maloney's declaration possessed the spontaneity characteristic of a res gestæ declaration. But its admissibility is challenged as being evidence incompetent *in substance* in that the declaration expresses a conjecture and not a perception.

Wigmore on Evidence, 2nd ed., Vol. 3, sec. 1747, page 738, says as to res gestæ:[1] ". . . under certain exter-

---

[1] Wigmore, 2nd ed., Vol. 1, page 466, sec. 218, condemns the term "res gestæ" as useless and vicious and demands its "abandonment once for all" as a "wholly unmanageable Latin phrase." He says that such acts as are receivable as res gestæ should be receivable as "necessary parts of the proof of an entire deed," or "inseparable elements of the deed," or "concomitant parts of the criminal act." He declares the phrase "useless, because every rule of evidence to which it has ever been applied exists as a part of some

nal circumstances of physical shock, a stress of nervous excitement may be produced which stills the reflective faculties and removes their control, so that the utterance which then occurs is a spontaneous and sincere response to the actual sensations and perceptions already produced by the external shock. Since this utterance is made under the immediate and uncontrolled domination of the senses, and during the brief period when considerations of self-interest could not have been brought fully to bear by reasoned reflection, the utterance may be taken as particularly trustworthy (or, at least, as lacking the usual grounds of untrustworthiness), and thus as expressing the real tenor of the speaker's belief as to the *facts just observed by him* [italics supplied]; and may therefore be received as testimony to those facts." Spontaneous declarations as to the mere belief of the declarant are also admissible *when such belief is a fact in issue.* In the instant case the state of Maloney's mind in respect to Fugmann was not a fact in issue and therefore his declaration of belief as to the defendant's sinister design toward him, was not competent. See Wigmore on Evidence, 2nd ed., Vol. 1, sec. 266, and also Vol. 3, sec. 1790, and 10 R. C. L., page 977, sec. 160.

In 22 C. J., page 469, sec. 558, it is set forth: "Expressions of opinion are not ordinarily admissible as part of the res gestæ, even though they are accompanied by acts tending to show that the declarant really entertained the opinion so expressed."

In *Hitchman v. Kerbaugh, Inc.,* 242 Pa. 582, 89 A. 669, proof that deceased, in answer to a question as to how an accidental explosion occurred, replied, "God only knows; I had plenty of water and plenty of steam," lacked the essential elements to make it admissible as a

---

other well established principle and can be explained in the terms of that principle," and "harmful, because by its ambiguity it invites the confusion of one rule with another and thus creates uncertainty as to the limitations of both."

declaration constituting part of the res gestæ, and was properly refused as a mere recital of the deceased's opinion of existing conditions prior to the accident.

In *Trexler v. B. & O. R. R. Co.,* 28 Pa. Superior Ct. 198, it was held that an expression of opinion as to the origin of a fire which destroyed a car, entertained by one not shown to have any knowledge or means of knowledge upon the subject, was inadmissible as res gestæ. President Judge RICE said: "It is quite as reasonable to presume that the declarant's opinion was based on what he had been told, or that it was a mere surmise based neither on what he had seen nor on what he had been told."[2]

Appellee cites *Com. v. Werntz,* 161 Pa. 591, 29 A. 272. In that case the declarations offered as part of the res gestæ were made by the victim of a stabbing. This court said the declarations should have been admitted, that they "were [made] *by the person best qualified to know the facts* [italics supplied]." Appellee calls attention to the definition which Justice MITCHELL quoted in the *Werntz Case* from Wharton on Evidence, sec. 259: "The res gestæ are the circumstances which are the undesigned incidents of the litigated act, which are admissible when illustrative of such act. . . . Their sole distinguishing feature is that they should be the necessary incidents of the litigated act. . . ." There is nothing in this definition which sanctions the admissibility of *incompetent* testimony even though it does possess the "distinguishing features" of a res gestæ declaration. In its spontaneity and temporal closeness to the central fact, a declaration may possess the *distinguishing features* of a res gestæ declaration, and yet clearly, on both reason and authority, a declaration possessing these

---

[2] Wigmore in discussing dying declarations, which though "hearsay" are regarded as evidence possessing about the same probative force as res gestæ declarations, states (Evidence, 2nd ed., Vol. 3, sec. 1445, page 177): "The declarant must have had actual observation or opportunity for observation of the fact which he relates." (Citing cases.)

"features" may be incompetent as stating something *not* based on knowledge.[3] For example, many courts have admitted as part of the res gestæ the exclamations or declarations of a mere bystander: *Coll v. Easton Transit Co.*, 180 Pa. 618, 37 A. 89. See also 22 C. J., p. 450. But no one would contend that if *another person* had been present when this fatal explosion occurred and had spontaneously exclaimed, "Fugmann did this," such a declaration would have been admissible, if the bystander had been unavailable as a witness; or that the bystander, if called as a witness, could have testified that "Fugmann did it," unless he had *knowledge of that fact.*

In *Com. v. Lehman*, 309 Pa. 486, 164 A. 526, cited by appellee, the declaration admitted as part of the res gestæ was made by the victim of the shooting who was within two feet of his assailant when the latter fatally shot him in the abdomen. He therefore had testimonial knowledge of the identity of his assailant.

Utterances relating to some distinct prior circumstance cannot be received. Maloney's exclamation must have been a conclusion from something that had taken place between him and Fugmann some time before. As Wigmore says (Vol. 3, sec. 1750, page 751): "The [spontaneous] utterance must relate to the circumstances of the occurrence preceding it." Maloney's utterance—so far as it involved Fugmann—did not relate to the circumstance of the occurrence (the explosion) which preceded it. It related to something which had preceded the explosion. (See *Agassiz v. Tramway Co.*, 21 W. R. 199.)

---

[3] A. C. Plowden, Grain or Chaff: the Autobiography of a Magistrate, 155: "An old woman in the witness box had been rattling on in the most voluble manner, until it was impossible to make head or tail of her evidence. The judge [Hawkins] tried his hand. But the old woman replied testily, 'It's no use your bothering me. I have told you all I know.' 'That may be,' said his lordship, 'but the question rather is—Do you *know* all you have *told* us?'"

A statement made by a participant in a central fact at the time or immediately after the "fact" and relative to that fact and not to something or based on something which preceded it, the statement being apparently the spontaneous result of the occurrence operating upon the perceptive senses of the speaker rather than the result of his inference or surmise, is admissible as a "res gestæ declaration." Neither the solemnity attending a "dying declaration" nor the spontaneity characterizing a "res gestæ declaration" makes the substance of such a declaration competent when by the standards of legal evidence it is *in*competent. The solemnity attendant upon the one and the spontaneity of the other are mere avouchments of sincerity and not unchallengeable passports of admissibility. The test of the competency of the evidence thus offered is: Would the evidence alleged to be kerneled in the declaration be admissible if the declarant was on the stand to make his declaration under oath? So tested Maloney's declaration is *in*admissible.

Since this evidence was inadmissible, was its admission *reversible* error? It was admitted "only as it relates to the proof of the general event and not, as any measure of proof of the guilt or innocence of defendant." As already stated, no "proof of the general event" can be admitted unless it meets the standards of legal admissibility in respect to competency, relevancy and materiality. For example, a defendant's social or other affiliations might superficially relate to the "general event" of a certain crime, yet in a court of justice it would be inadmissible unless it possessed legally probative value.[4] However, when the trial judge admits something in relation to "the general event" and at the same time or later in his charge instructs the jury that such evidence is "not any measure of proof of a defendant's guilt or innocence," it must be taken for granted

---

[4] Sometimes legally unimportant matters concerning a defendant are admitted, usually without objection, as mere "background."

that the jury obeys the instruction and that therefore the admission of what was legally inadmissible evidence was *harmless* error. Under certain circumstances the trial judge or the appellate tribunal may be moved to consider the error in admitting the evidence not "cured" by the subsequent striking *out of the testimony or by* the explicit direction to disregard it as proof of any fact in issue. In such a situation a new trial would be ordered.

There is seldom any criminal or civil trial of any *magnitude or duration into the record of which some ir-*relevant, incompetent and immaterial testimony does not "creep" and has been subsequently "stricken out" and the jury instructed to "disregard it." To grant new trials whenever such a thing occurred would mean an *interminable and intolerable succession of new trials.* There is no standard by which the effect of such formally "sterilized" testimony on the minds of the jury can be gauged. In *theory* the law intends that no testimony shall have any but a logical effect on jurors' minds; in practice, nearly all testimony has both a logical and a psychological effect in varying ratios. The law intends that no witness's testimony shall make any appeal except to the jurors' reasoning faculties; in actual practice, a witness's testimony sometimes makes more of an appeal to the emotions than to the reason. For example, in a murder trial, the victim's widow may testify to some relevant fact of only minor importance while her very appearance before the jury may arouse the jury's feelings against the defendant. On the other hand, the appearance of the defendant's wife on the stand may by awakening the juror's compassion for her, help the defendant's cause far more than does her testimony. These only illustrate the human limitations on the practical administration of justice. The ideal of decisions based on clearly proved *facts* synthesized into judgments by coldly logical processes is—like most ideals—one that may be constantly approached but never reached.

In the instant case the trial judge in his charge told the jury that Maloney's declaration had "absolutely no value to prove anything as to the guilt of Michael Fugmann. . . . You have no right to consider it in any degree as affecting his guilt. It has no bearing on it. . . . If this defendant is to be found guilty, it must be exclusively on the other evidence in this case."

If a trial judge or the appellate tribunal believes that the introduction of incompetent testimony subsequently stricken out or ordered disregarded, excites the jury's prejudice against a prisoner or that the jury disobeyed its instructions to base its verdict exclusively on the other evidence in the case, a new trial should be granted. In *Penna. R. R. Co. v. Butler,* 57 Pa. 335, 338, this court held that "if improper evidence is given . . . and it is not struck out at or before the close of the testimony, so that counsel shall not be allowed to refer to or dwell upon it in their address to the jury, it is altogether too late to cure the mistake by directing the jury to disregard it in the charge." To the same effect is *Erie & W. V. R. R. Co. v. Smith,* 125 Pa. 259, 264, 17 A. 443. The point in these opinions is that if the improper evidence is commented upon by counsel for the litigant whom it favors, the error of its admission is not cured.

In the instant case Commonwealth's counsel knew as soon as the objection to the admission of this evidence was overruled that he could *not* use it "as any measure of proof of the guilt or innocence of defendant." In his charge the trial judge also said to the jury: "You will recall that the District Attorney in presenting his case to you made no reference to it [Maloney's statement] as a piece of evidence." In view of this fact the admission of this incompetent testimony does not fall within the rule that it is reversible error if the striking out of the testimony is not so timely as to preclude counsel's referring to it in his closing argument. In the case now before us there was no formal "striking out" of the testimony but we have its equivalent in what the trial judge

said when he admitted the testimony and what he said in his charge as to this testimony's limited purpose. In *D. & H. Co. v. Barnes*, 31 Pa. 193, 196, this court said: "Undoubtedly, when a mistake has been made in the admission of evidence on the trial of a cause, it may subsequently be rectified." In the case at bar, whatever error the court made in admitting Maloney's statement as to Fugmann's having "done it" was subsequently rectified. In view of the fact that counsel made no comment on Maloney's statement the rectification was timely. The first assignment of error is overruled.

The second assignment of error is that the "trial judge erred in his charge in failing to limit evidence relating to the commission of other crimes to purposes of identifying the defendant with the crime for which he was on trial, and in failing to caution the jury that proof of commission of other crimes by defendant should not be considered by or prejudice them in determining the guilt of defendant." At the trial counsel for defendant objected to the offers of proof by the Commonwealth of these alleged other crimes upon the ground that they "tended to prove separate, distinct and unrelated crimes." The court properly overruled these objections. It is well settled that "evidence of other crimes is competent to prove the specific crime charged when it tends to establish (1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the others; (5) the identity of the person charged with the commission of the crime on trial. . . .": *Com. v. Strantz*, 328 Pa. 33, 44, 195 A. 75.

In the instant case appellant does not complain of the admission of proof of other crimes but of the absence of specific instructions by the court as to their limited probative value. No request was submitted for such specific instruction and no specific objection was made to the omission now complained of.

The jurors who listened to the charge of the court could not have been left in any doubt that they were trying the defendant for the murder of Thomas Maloney, Sr., only. It could not have been otherwise than clear to them that the testimony as to other crimes was submitted first, for the purpose of showing that all these obviously related crimes were conceived by the same diabolic mind and that the instruments of death were contrived by the same fiendish ingenuity. Then, secondly, if the defendant left the impression of his handiwork on the other bombs, as the Commonwealth's evidence tended to prove, and these other bombs and the bomb that killed Maloney were the products of the same contriver, it followed by clear logic that Fugmann was criminally connected with the making and sending of the bomb that killed Maloney.

The trial judge, after stating in his charge that the defendant was on trial for the murder of Thomas Maloney, Sr., said: ". . . It is for you to determine whether the person who brought about the violence which resulted in the death of Thomas Maloney, Sr., is the defendant who is here before us." As to the evidence of the other crimes, the court said: "You will compare the printing that was done by Fugmann with the printing that was found on these various bombs, to determine whether or not those bombs were made by Fugmann. . . . You must also determine that the handwriting on the Maloney bomb is the handwriting of Michael Fugmann; and these bombs are in evidence only because the Commonwealth urges that all these matters were in close relation, that the person who made one of them, or made those that were recovered, was necessarily in a fair conclusion from the evidence the person that made the others, and *it is for that reason alone* [italics supplied] that you have the right to consider what he found on those bombs." The court gave similar instructions as to the nails and the wood with which the various bombs were made and the paper that

was used to wrap these bombs, which was similar to the paper found in Fugmann's home. From all these and other instructions in the charge, the jury could have been left in no doubt that the purpose of the evidence as to the other crimes and their instrumentalities was to show that *all* these crimes were the products of the same criminal brain and hand and that therefore any bit of evidence which connected the defendant *with the other crimes,* connected him by logical deduction with the crime of murdering the victim named in the indictment. The second assignment is overruled.

The third assignment is "that the trial judge erred in his instructions to the jury on the value, use and effect of evidence of prior good character and reputation."

The particular part of the charge assigned as error is as follows: "While good character is substantive evidence, and it is to be weighed and measured and considered with the other evidence in determining whether you believe Fugmann was guilty of this offense, and so might be sufficient to raise a reasonable doubt, *still we say to you again if the other evidence in the case convinces you beyond a reasonable doubt that he did perpetrate this offense, the fact that he had been of good reputation before would not under such circumstances be sufficient to warrant you in treating it as a reasonable doubt, and resolving it in his favor."* (Italics supplied.) This part of the charge standing alone is erroneous: *Com. v. Cleary,* 135 Pa. 64, 84, 19 A. 1017, for it implies that the jury might consider "the other evidence" alone and be thereby convinced of the defendant's guilt beyond a reasonable doubt, whereas the law strictly requires that before a jury can find beyond a reasonable doubt that a defendant is guilty, it must consider *all* the evidence, *including* the evidence of *good repute.* What the trial judge meant to convey to the jury was the thought that if after considering *all* the evidence, including the evidence of good repute, the jury was convinced beyond a reasonable doubt of the defendant's guilt, he should not

be acquitted merely because the jury also found (if such was to be its finding) that he had a good repute. However, a few lines before the criticized excerpt italicized by the appellant in his paper book, the trial judge stated to the jury: "It might be that good character by itself would be sufficient to raise in your minds a reasonable doubt as to whether a person who has earned that reputation would be likely to perpetrate the type of offense with which he is charged." Furthermore the court affirmed the defendant's "seventh point" which reads as follows: "Evidence of good character is substantive evidence and not a mere makeweight introduced into a doubtful case. It may of itself create a reasonable doubt and thereby produce an acquittal." In considering the charge as a whole on the subject of good repute, we think the jurors clearly understood that if they found as a fact that the defendant had possessed a reputation as a peaceful, law-abiding citizen before being charged with the crime named in the indictment, and if this fact either standing alone or with all the other evidence in the case generated in their minds a reasonable doubt of the defendant's guilt, he was entitled to the benefit of it and should be acquitted. Defendant's counsel were apparently satisfied with the affirmation of their "seventh point," for they asked for no further instructions on the effect of "character testimony." This assignment is overruled.

The fourth assignment is based on the following instruction of the court to the jury: "If you believe that the handwriting on the bomb that killed Thomas Maloney is the handwriting of Michael Fugmann, if you believe it beyond a reasonable doubt, then we will say to you, members of the jury, that standing unexplained would to the mind of this court be sufficient for you to base a verdict of guilty of the offense of which he stands charged." We find no error in this. If the jurors found beyond a reasonable doubt that Fugmann addressed the package which contained the fatal bomb and that no ex-

planation was made indicating that he did so in ignorance of the package's deadly contents, they would have a right to *infer* either that he alone schemed and contrived the instrumentality and mailed it or that he, with a felonious intent, participated in that criminal undertaking, all with the intent to take the life of the addressee. If Fugmann addressed this package *without knowledge of its lethal character,* he could have said so. The excerpt complained of contains the qualifying words "if unexplained." Under the circumstances here present it is permissible for a jury to infer the criminal intent of an addresser. The felonious connection of a defendant with the death of a person who received through the mails a deadly poison in a package alleged to have been addressed by him, was inferred by the jury in the case of *People v. Molineux,* 168 N. Y. 264, 61 N. E. 286. In that case the similarity between the handwriting on the "poison package" and the defendant's handwriting was the basis of the conviction obtained. (The judgment was reversed on other grounds.) As to the probative value of proof of handwriting in criminal cases, see *State of New Jersey v. Bruno Hauptmann,* 180 A. 809. In that case the Court of Errors and Appeals of New Jersey, in an opinion by Mr. Justice PARKER, said, after referring to the identification of the handwriting on all the ransom notes, including the one left on the window sill of the nursery window, as that of the defendant, Hauptmann: "It is an inescapable inference that the writer of the ransom note on the window sill entered the nursery and perpetrated the crime." In the case at bar Fugmann, instead of attempting to "explain" what the Commonwealth charged was his "handwriting" on the explosive package, denied it. This only emphasized its significance if the jury found it to be his. County Detective Richard Powell testified that on the second of July, 1936, the day after Fugmann's arrest, when he showed him the labels of the boxes containing the bombs which had been addressed, respectively, to

Judge B. R. Jones, Harry Gouldstone, James Gorman and Luther Kniffen, and called his attention to the printing of the names and addresses, he said that "it was his printing, that he would go down to the Courthouse and tell Judge Valentine that it was his printing, but that he did not put it there." The witness stated that Fugmann repeated this "at least a half a dozen or a dozen times." This assignment is overruled.

The fifth assignment of error is that the charge of the court "was inadequate, did not fairly present the case, and unduly emphasized the evidence of the Commonwealth and minimized the evidence of the defendant." We find no basis for this specification. The charge of the learned trial judge was comprehensive, fair and painstaking. At the close of the charge he invited suggestions from respective counsel as to "anything further." The reply of defendant's counsel was merely a request for a "general exception" and an inquiry as to whether handwriting charts were to be sent out with the jury. This assignment is overruled.

The sixth assignment is based on the admission in evidence "of expert opinions on the identity, source, and similarity of wood, nails, glue and paper." As to these experts the trial judge aptly said in his opinion refusing a new trial: "The Commonwealth called witnesses extraordinarily qualified, each the outstanding expert in the United States of his particular branch. A reading of the record will disclose their extraordinary preparation, study, experience, and skill in their individual lines. There can not be any doubt as to their respective qualifications."

The use of expert witnesses in the trials of cases has long been recognized and the area of their testimonial service is being constantly extended. In *Com. v. Westwood*, 324 Pa. 289, 188 A. 304, we permitted expert witnesses to testify that "the paraffin test" which was applied to the hands of the accused after the alleged murder was committed, showed that there were particles of

partially burned gunpowder on his right hand near and back of his index and ring finger. In that case we quoted Wigmore on Evidence, 2nd ed., Vol. 1, section 555, as follows: ". . . In a strict sense, every witness whosoever is an expert. In other words, the very fact that he is allowed to speak at all assumes that he is fitted to have knowledge on the subject; though in the vast majority of matters no demonstration of his fitness is needed."

In 1823 it was said by Justice GIBSON in *Cornell et al. v. Green, Admr.,* 10 S. & R. 14, 16: ". . . Wherever the facts from which a witness received an impression . . . are too complicated to be separated and distinctly narrated, his impressions from these facts become evidence; and this on the ground that it is the best evidence of which the nature of the case is susceptible." In *Mayor v. Pentz,* 24 Wend. 668, 674 (1840), it was said by Verplanck, Sen.: "Opinion is admitted when a jury is incompetent to infer without the aid of greater skill than their own, as to the probable existence of the facts to be ascertained, or the likelihood of their occurring from the facts actually proved before them. . . . All these [scientific opinions] are testimonies to general facts which the jury can ascertain in no other way. . . ."

In *Coyle v. Com.,* 104 Pa. 117 (1883), this court said in referring to expert witnesses: "Their proper office is to instruct the court and jury in matters so far removed from the ordinary pursuits of life, that accurate knowledge of them can only be acquired by continued study and experience; the purpose is to enable both court and jury to judge intelligently of the force and application of the facts introduced in evidence, as they would have been able to do if they had been persons properly instructed upon the subjects involved. Expert testimony, owing perhaps to the greater extent of recent scientific research, is much more frequently resorted to than formerly."

Appellant in his brief says in reference to handwriting testimony: "It required an Act of Assembly (Act of 1895, P. L. 69, as amended by the Act of 1913, P. L. 451, 28 PS section 161) to give to it in law, the full fruition it had already enjoyed elsewhere." Even before the acts referred to, the testimony of experts on handwriting was received in evidence. See *Travis v. Brown,* 43 Pa. 9. See also *People v. Molineux,* supra, as to the admissibility at common law of evidence as to disputed handwriting. In *Seaman v. Husband,* 256 Pa. 571, 575, 100 A. 941, it is stated that "prior to the Act of May 15, 1895, P. L. 69, witnesses were not permitted in this Commonwealth to *compare* disputed with admittedly genuine writings [italics supplied]."

The opinions of the experts quoted in this case was of great relevancy. Professor Arthur Koehler of the Forest Products Laboratories at Madison, Wisconsin, an expert of national repute, testified that the wood in the crosspieces in the deadly cigar boxes matched the wood found in Fugmann's cellar, that the wood found in this cellar and that used in the crosspieces had been cut within "close proximity" of each other on the same machine in a saw mill, that they had been stapled in the same staple-cutting machine, and that other tests indubitably showed that they had the same origin. Stanley R. Keith, a metallurgical engineer, and a nail expert of undoubted qualifications, testified that the nails used by the maker of the bombs as auxiliary nails in fastening the lids were identical with the nails found in the steel cabinet in defendant's cellar and also in the shoes belonging to defendant which the latter had personally repaired. These nails "matched one another with microscopic accuracy." The witness also testified that the nails found in defendant's home had been made by the same machine and the same dies as the nails found in the boxes which contained the bombs. A glue expert, Dr. Elwin E. Harris of the Forest Products Laboratories at Madison, Wisconsin, testified that the glue

which was used in the insertion of the crosspieces of the bombs and on the copper wire leads was "a peculiar fish formula, to wit, Rogers Glue." From the premises of defendant was taken a kitchen chair which had been repaired by glue. This glue the defendant received from a carpenter in the Hess Goldsmith Silk Mill. When defendant was arrested and asked if he received a quantity of glue from this carpenter, he denied knowledge of any such person or recollection of receiving any glue from him. Later, when the carpenter was brought before the defendant, he remembered the incident but said that the name of the man had been mispronounced and he did not recall it. The glue which was given to defendant by this man was "Rogers Glue." We have already referred to the expert testimony as to the type of powder used in these bombs being of the same type that was found concealed on defendant's premises. Experts called on behalf of the Commonwealth revealed a high degree of competency and their testimony was of great probative value. The sixth assignment is overruled.

The seventh assignment is based on the fact that two alternate jurors were used as provided by the Act of May 1, 1935, P. L. 127 (17 PS 1153). Appellant argues that the use of these alternate jurors "constituted a violation of defendant's constitutional right." The argument of appellant on this point is as follows: "The Constitution guarantees that 'trial by jury shall be as heretofore, and the right thereof remain inviolate'; . . . it was the established custom and practice to keep the twelve jurors together in a capital case, from the time they were impanelled until their discharge after verdict rendered. The reason for it is plain. It was deemed prudent that in a case where life or death was the issue, all danger of external influence upon a jury's verdict should be removed."

It is well settled that the word "inviolate" as used in the constitutional provision quoted means freedom from substantial impairment. It does not import rigidity of

regulation in the manner of impanelling a jury. The cardinal principle is that the *essential features* of trial by jury as known at the common law shall be preserved. The fundamental law preserves the substance of the right; details of administration which leave the enjoyment of the right unaffected are of no constitutional concern. The right to trial by jury has sometimes been figuratively referred to as "the jewel of Anglo-Saxon jurisprudence." The challenged act of assembly leaves the "jewel" untouched and undimmed and affects only its "setting." The essentials of a trial by jury of a defendant in a criminal case as known at the common law were: (1) a jury composed of twelve[5] eligible persons duly summoned, sworn and impanelled for the trial of the issue; (2) a plea entered; (3) an ample right of challenge both for cause and peremptorily, secured to defendant; (4) a full, fair and public trial "under the superintendence of a judge empowered to instruct them on the law and to advise them on the facts, and (except on acquittal of a criminal charge) to set aside their verdict if in his opinion it is against the law or the evidence": *Capital Traction Co. v. Hof,* 174 U. S. 1, 13-16; (5) proper and sworn testimony for the jury's consideration; (6) unanimity of the vote supporting the verdict. See 3 Blackstone, Chapter 23; *Com. v. Hall,* 291 Pa. 341, 140 A. 626; *Com. v. Robinson,* 317 Pa. 321, 176 A. 908, and *Patton v. U. S.,* 281 U. S. 291.

A departure from any of these essentials would be a deprivation of "the right to trial by jury." Blackstone also lists (page 376) these three "circumstances" which would "vitiate the verdict": "[A] If the jury speaks

---

[5] "And first as to their [the jury's] number twelve; and this number is no less esteemed by our law than by Holy Writ. If the twelve apostles on their twelve thrones must try us in our eternal state, good reason hath the law to appoint the number of twelve to try our temporal. The tribes of Israel were twelve, the patriarchs were twelve, and Solomon's officers were twelve. 1 Kings 4, 7": Duncomb's Trials per Pais (1665), 8th ed. (London, 1766), p. 92.

with either of the parties or their agents, after they have gone from the bar; or [B] if they receive any fresh evidence in private; or [C] if to prevent disputes they cast lots for whom they shall find." Of none of the foregoing essentials of a jury trial was the defendant deprived. None of these irregularities are charged.

But it is argued in appellant's behalf: "The constitutional provision requires that in a capital case a jury of twelve be kept together and removed from every external influence. Here the twelve men were kept together but they were accompanied by two alternates who are entirely foreign to our constitutional mandate to a jury trial. . . . We have no doubt they talked and discussed with the twelve jurors during the trial."

It need scarcely be stated that a violation of a defendant's constitutional rights cannot be found on something which counsel say they "have no doubt" of, but as to which *the record is utterly barren of proof.* That the two alternates remain with the jurors until the latter retire to deliberate (as the act requires) no more impairs a defendant's right to trial by jury than does the fact that tipstaffs "accompany" the jurors from the moment of their selection until the verdict is returned, that persons "wait on" them when they dine, and that, when jurors are ill, physicians treat them. It could as logically be argued that since under our Constitution the essentials of trial by jury at common law must still be vouchsafed a defendant in a criminal case and since at common law jurors could not "eat or drink or have any eatables about them, without consent of court, and before verdict," the appellant in the instant case did not have the trial by jury he was entitled to because the jury may have been served with food and drink during their deliberations and without the court's permission.[6]

---

[6] It might also with equal plausibility be contended that since at common law if a jury did not agree before the judge "left town," it was customary for him to "carry them around the circuit from town to town in a cart," this defendant's right to trial by jury

The conclusion we have reached as to the lack of merit in the seventh assignment of error, is in accordance with the conclusion reached by appellate courts in other states on the same question. See *People v. Mitchell,* 266 N. Y. 15, 193 N. E. 445; *People v. Peete,* 54 Cal. App. 333, 202 P. 51, and *State v. Dalton,* 206 N. C. 507, 174 S. E. 422. This assignment of error is overruled.

The evidence in this case amply warranted a conviction. In reading this record one is impressed not only with the convincing character of the Commonwealth's proof but also with the apparent lack of candor and truthfulness in the defendant's testimony. For example, his explanation as to why he secured four or five cigar boxes three weeks before this homicide does not appear to "fit the facts." He declared he wanted the boxes for his "small tools." When asked why he did not keep these tools in his cabinet containing five or six drawers, he replied: "I don't know." When asked, "What kind of tools did you use?" he replied, "I got nuts and that stuff out of my car." Later he said he also had "small nails." He admitted under cross-examination that he "had these tools for about six years" and yet when asked: "You didn't look around for cigar boxes until about three weeks before this bombing?" he answered: "No." His explanation as to the flashlight batteries found in his home (similar to the batteries used in the bombs) was also unsatisfactory. He admitted that they did not fit his flashlight and that when he bought the batteries he did not take his flashlight along to fit the batteries into it. He also admitted that he had obtained several sheets of "brown wrapping paper about three feet square" from Richard Stroshal, that he took them home and then did not see the paper any

_____

was violated because the trial judge "specially assigned" in this case may have returned to his home before the jury agreed and without taking them with him.

more.   Stroshal testified this paper was obtained from him in May or June, 1935.

The Commonwealth showed a possible motive for the slaying of Thomas Maloney, Sr., in the ill feeling engendered in the defendant by his inability to get Maloney to repay the loan hereinbefore referred to.   The record shows that Fugmann and Maloney had formerly for a considerable period been on very friendly terms, Fugmann frequently visiting Maloney's home, and that these friendly relations had later given way to hostile feeling on the part of Fugmann.   A fellow workman of Fugmann testified that in February, 1935, the latter had told him that Maloney had put "three sticks of dynamite on his [Fugmann's] porch" and that Fugmann said: "There is nothing too dirty for me to do to that dirty rat."   Proof of motive or of adequate motive is, of course, no essential part of the Commonwealth's case when a conviction for crime is asked for: *Com. v. Danz,* 211 Pa. 507, 60 A. 1070.   The Commonwealth made no attempt to show the motive for the making and mailing of the other deadly bombs alleged to be the defendant's handiwork.

Fugmann admitted on cross-examination that he several times visited the grave of the little boy, Thomas Maloney, Jr., who was fatally injured in the same explosion that killed his father.   When Fugmann was asked: "Didn't you tell the officers that you were in the bushes by the grave one night?" he answered: "I was looking [for] some man, I thought for sure somebody come around sometime.   Q. You thought that the murderer would come back to the grave? . . . Is that right?" He answered, "Yes, sir."   This eerie conduct on the defendant's part is logically inexplicable, but no more so than is the weird, brutal, and craftily committed murder this record discloses.

The judgment is affirmed; the record is remitted to the court below so that sentence may be executed.

Mr. Justice DREW concurs in the judgment.