## Phillips, Appellant, *v.* B. & N. Oil & Gas Company et al.

Argued April 15, 1947. Before RHODES, P. J., HIRT, RENO, DITHRICH, ROSS and ARNOLD, JJ.

*W. Robert Thompson,* with him *Montgomery & Thompson,* for appellant.

*Thomas R. Balaban,* with him *Reinhart & Balaban,* for appellees.

OPINION BY ARNOLD, J., July 17, 1947:

In this workmen's compensation case the employe's widow asserts that her husband's death was the result of an industrial accident occurring on November 1, 1935, in which he suffered a spiral fracture of the right humerus. An open agreement between the employe and the employer was approved in December, 1935. He was treated by a local physician until January 1, 1936, when he was placed in the care of a skilled orthopedic surgeon in Pittsburgh and there hospitalized on February 5, 1936. On February 28 the fracture was reduced under an anaesthetic and a plaster of paris cast was applied. He was discharged from the hospital on March 23 after what is described as "an uneventful recovery." His health deteriorated and he died on October 2, 1936. The claimant contended that death was due to asthma with resulting dilatation of the air cells (alveoli) of the lungs: emphysema; and that this was brought about by a cold or chill suffered when a patient in the hospital, either during the operation or immediately thereafter. The defendant denied these allegations, and asserted that death was the result of a cardiac condition which caused the asthma, or due to a preexisting asthma, and that neither of these conditions was caused by the accident. It likewise denied that the patient suffered any chill or cold while in the hospital. The referee did not find any causal connection between the accident and the death, and dismissed the petition. The board, through Chairman Ullman, granted a rehearing and appointed an impartial expert whose testimony, distinctly adverse to the claimant's position, was that neither the accident nor the hospitalization had anything to do with the deced-

ent's death, which, in his opinion, was directly due to an acute dilatation of the heart superimposed on a chronic myocarditis, and that the asthma which the man suffered was of a cardiac origin. The referee again dismissed the petition and was affirmed by the board. On appeal to the Court of Common Pleas the record was remanded for further testimony, and after this was taken the referee again dismissed and was again affirmed by the board, and by the court below in an opinion by HOOK, P. J.

In this appeal it is contended that there is "no competent evidence to sustain the dismissal." That contention is untenable because the triers of the facts decided *against* the claimant, who had the burden of proof on the issue of the causal connection between the accident and the death. On appeal before the courts the question then is only whether the findings of fact can be sustained without a capricious disregard of testimony, and are consistent with each other and with the conclusions of law and final order; and this is so even though uncontradicted testimony is not accepted as true: *Walsh v. Penn Anthracite Mining Company,* 147 Pa. Superior Ct. 328, 24 A. 2d 51.

At the three hearings the claimant sought to establish that the ward of the hospital was cold when the deceased was brought from the operating room; that the plaster cast was wet; that he was cold, had insufficient covers, and that a blanket had been requested by his wife but not furnished, and he suffered a chill or cold therefrom. It was also suggested that he suffered a chill in the operating room. Two physicians testified for the claimant. One gave the opinion that the death was the result of asthma causing emphysema, and that these were attributable to the "cold [plaster of paris] cast being put on there [in the hospital] and no drier used." The other stated that the asthma was caused by bronchitis which in turn "might have been [due to] the sudden changes [of bodily temperature] after he

had a [plaster of paris] cast on that was cold. It *may* have chilled his surface and [given] him bronchitis." (Emphasis supplied). He also stated that he didn't know if his statements were correct; and admitted that after his discharge from the hospital the patient stated that he had had asthma while in the hospital. He finally attributed the asthma to bronchitis and it to the "wet pack . . . put on him in the . . . hospital." On behalf of the defendant it was shown that although the deceased entered the hospital February 5 and that the fracture was reduced on February 28, and he was not discharged until March 23,—the hospital charts, which constitute the bedside record of the patient, showed nothing concerning any chill, cold, excess temperature or complaint of any of them, or anything indicating bronchitis or cold. Five doctors, one of whom performed the autopsy, and all of whom had been professionally concerned with the deceased in his illness, testified for the defendant to the effect (a) that the operating room was warm and the patient could not have been chilled therein; (b) that the wet plaster of paris cast in drying produced heat, so that the patient could not have been chilled immediately after its application; (c) that neither the asthma nor the consequent death had any relationship to the original accident and were unconnected with anything involved in his operation or hospitalization, and that the accident did not aggravate any preëxisting ailment. The impartial expert not only testified that the accident was unconnected with the death (as we have previously pointed out) but also testified that if the patient complained of being chilly when brought to the ward from the operation, it would not be due to the wet plaster of paris cast (which would produce heat next to the skin) but to nervous shock which would give the impression of cold.

The appellant argues that the evidence that a wet plaster of paris cast would generate heat while drying is incompetent, or at least should not be believed where

lay testimony exists that the patient became cold. The doctors who thus testified were experts on facts, and it was not opinion evidence as that term is generally used. Rather it was the proof of a fact, a scientific fact, outside the ambit of ordinary knowledge and therefore admissible by necessity. The fact thus proved was that a plaster of paris cast in drying generates heat, and this is in the same category as any chemical analysis; the flashing point of oils, the properties of electricity; or that a given stain is from blood; the type of certain blood; fingerprints and ballistics; and the various microscopic, spectroscopic and radiologic examinations. Cf. *Commonwealth v. Fugmann*, 330 Pa. 4, 25, et seq., 198 A. 99; and see Underhill's Criminal Evidence, (4th ed.) §§239, 243.

The interpretation or conclusion drawn by an expert from a fact or facts is what we usually term opinion or expert evidence. Here medical experts testify that since the drying cast generated heat, *in their opinion* the patient did not suffer a chill. This expert opinion was competent evidence. Lay testimony that the patient did become chilled did not require the fact-finders to accept it as true, and the scientific fact of the heat generated by the cast was not thereby overcome conclusively. In fact, the lay testimony was considerably weakened in that the patient's hospital charts disclosed no chill, no cold, no bronchitis and no complaints of any of them, although the patient remained in the hospital for more than three weeks after the operation.

The appellant contends that the referee admitted and considered incompetent evidence, to wit that the ward on other occasions, and generally, was warm, not cold. While a situation may arise requiring a reversal because the compensation authorities gave weight to incompetent testimony in deciding against the person having the burden of proof, this is not such a case, for this evidence was received without objection. Moreover it did have relevancy and evidential value in that the nurses

and the supervisor testified that they were frequently in the ward immediately following the patient's reception after the operation, and that they did not notice any coolness in the temperature, and that they *probably would have noticed* such a condition if it had existed, *because* the ward was invariably warm. It was some evidence, not that the room was warm, but that their failure to perceive was unlikely, because the thing to be perceived was unusual, and thus that their evidence was not merely negative.

When the testimony closed the issue was one of fact: What should be accepted as true? This was determinable exclusively by the compensation authorities, and the courts are without power to find the facts anew.

Judgment affirmed.