**STATE, Plaintiff-Appellee, v. HICKMAN, Defendant-Appellant.**

Ohio Appeals, Second District, Montgomery County.

No. 1874.   Decided December 20, 1945

Mathias H. Heck, Prosecuting Attorney, M. J. Gilbert and Fred M. Kerr, Asst. Prosecuting Attorneys, Dayton, for plaintiff-appellee.

C. W. Magsig, Dayton, Louis R. Mahrt, Dayton, for defendant-appellant.

## OPINION

By WISEMAN, J:

This is an appeal on law from the Common Pleas Court of Montgomery County, Ohio. The defendant-appellant, Lucille Hickman, was tried for murder in the first degree and found guilty with mercy recommended. She was sentenced by the court to the Ohio Reformatory for Women at Marysville, Ohio, for and during the remainder of her natural life.

The defendant contends that the trial court erred in overruling her motion for a dismissal at the close of the state's case; that the verdict of the jury is against the manifest weight of the evidence; that the verdict of the jury is contrary to law. These assignments of error raise the question as to the sufficiency of the proof.

A brief statement of facts will suffice.

We do not believe it is necessary to review all the sordid details leading up to the night of the murder. We have read the record and find that the defendant testified that her husband abused her daughter who lived with them and who was eight years old at the time of the murder. Regardless of how abusive her husband was toward her daughter, such abuse does not furnish sufficient legal justification for killing her husband. Furthermore, regardless of the number of threats which her husband may have made to kill both her and her daughter, such threats alone do not furnish a sufficient legal justification for the killing.

The record in this case shows that the defendant married Paris Cloud in 1933, to which union two children were born, a son, Hooper Cloud, and a daughter, Vera Jean Cloud. Later she obtained a divorce and was given the custody of her daughter, Vera Jean. Sometime after the granting of the divorce, she met George Hickman in the state of Tennessee. George Hickman came to Dayton and secured employment, after which he returned to Tennessee and brought Lucille Hickman, together with her duaghter, Vera Jean, to Dayton, where they were married on March 25, 1939. They lived in rooming houses on Fourth Street, Proctor, Washington, Robert Boulevard, Bainbridge, McDonough, Chestnut and other places in

and around Dayton, Ohio. She testified that in the fall of 1943, after her husband told her that he had already spent too much money on her, and that she was nothing but a cripple, she separated from him and moved to Knoxville, Tennessee, taking her daughter, Vera Jean, with her. Several months later her husband communicated with her, which resulted in her husband going to Knoxville and bringing his wife and step-daughter back to Dayton, which occurred in January of 1944. The defendant testified that during the trip to Knoxville her daughter told her that she had been abused by the step-father; that in December, 1944, they visited a friend on Bainbridge Street, and at the solicitation of the friend, stayed all night; that she, her husband and her daughter that night slept in one bed; that she was awakened during the night by a conversation taking place between her husband and her daughter, from which she judged that her husband had molested her daughter; that she jumped from the bed and turned on the light; that from that time on her husband, realizing that she knew of his abuse of her daughter, made numerous inquiries as to whether she had made a complaint to the police; and that he often made threats to kill both of them rather than face the charge which might result in confinement in the penitentiary.

The record further shows that in September, 1944, after she filed a suit for divorce against her husband, he told her that he had bought a gun, and that it was a present for her and that if she went ahead and got the divorce, it wouldn't do her any good. She dismissed the divorce case and returned to her husband. A short time after this occurred, they went to live on Chestnut Street, where the killing took place.

Defendant claims that at one time her husband showed the gun to her, and there is also testimony in the record to the effect that her husband, who worked at the Frigidaire plant, had exhibited a gun to a fellow workman in the month of December, 1944. One Effie Bramsway, who lived on Bainbridge Street, and a friend of the Hickman's, testified that George Hickman had sold the gun to Mr. Hughes who lived in the same residence as the witness. There is nothing in the record to show that the defendant had any knowledge of the gun being sold.

On Tuesday night, February 20, 1945, after they had gone to bed, Hickman asked the defendant whether she had been any place that day. She told him that she had not been away. Whereupon he told her that "he had to do something and that the only thing he knew to do was to kill" Vera Jean and the

defendant "because he had no intention of waiting until the law got him." Defendant testified that she told her husband he might kill her, but to leave her baby alone. To this statement he replied: "I can't do that and you know that." When she asked him why, he said: "She knowed more about it than I did", and that he was going to do it as he had no other choice. The next day she went to police headquarters and complained to Sargeant McElhaney about her husband's threat to kill both her and her daughter. She inquired how long her husband could be restrained, if a complaint should be filed. The officer informed her that he could be released on bond almost immediately. She left police headquarters without filing a complaint. On her way home, she walked down Jefferson Street and passed a pawn shop. She stopped at the window and looked at the guns. She did not enter, but walked by the shop, after which she turned back and went into the pawn shop, at which time the clerk showed her a gun. She did not make the purchase at that time. She testified as follows:

"Q. What did you do?

A. I couldn't make up my mind so I went out of the pawn shop, went up to about the corner of Fourth Street and Jefferson a little ways, then I thought, I can't go home.

Q. What did you mean when you said 'I couldn't make up my mind'?

A. I didn't want to take a chance on getting away from him; I didn't know whether to take a chance on trying to get away from him before he killed Vera Jean and I, or to go on home. I didn't know what to do; I had no place to go and no money to go and keep my baby and I together.

"Q. What did you finally decide to do?

A. I decided to go back to the pawn shop and buy the gun.

Q. Did you return to the same pawn shop?

A. Yes, I did.

Q. Did you buy the gun?

A. Yes, I bought the gun."

After she purchased the gun, she inquired of the clerk how to operate the gun, and he instructed her. She then purchased a number of cartridges and left for her home. She testified that she had borrowed money from her father that day to pay the rent and for the purchase of groceries; that she used this money to pay for the gun. On the night of the

killing, she had prepared a meal and had invited the McDaniels over to eat the evening meal with them, which they did. The McDaniels lived in adjoining rooms. Mrs. McDaniel testified, as did her daughter, that everything seemed to be friendly between the Hickmans on that evening. The record shows that between 9:00 and 9:30 p.m. George Hickman went to bed and a short time thereafter, the defendant bathed Vera Jean and placed her in bed, after which she, the defendant, took the gun from the place where she had secreted it in the kitchen and loaded it; that she entered the bed room, turned out the lights, placed the gun under her pillow and went to bed. The defendant testified that as she went to bed, her husband said that he was going to have to do the same thing as his brother Hank did, (his brother Hank shot and killed his wife and himself a short time previously) as he could not stand it any longer; that he was going to shoot both of them, meaning the defendant and her daughter. At this point the defendant testified as follows:

"Q. What did he do?
A. He turned over to his right side, throwed his hand up to the pillow and I thought he was reaching for a gun. I didn't know what he had.
Q. What did you do?
A. I pulled the gun out and shot him."

She further testified that she then called the McDaniels, who on being aroused by the shooting, opened the door leading into the Hickman apartment. Mrs. McDaniel testified she heard Mrs. Hickman say: "I did it." Mr. McDaniel summoned the officers, who arrived within a few minutes. Officer Woodall testified that the defendant told him that evening that Mr. Hickman was in bed when she shot him, and that he was lying on the bed. Officer Teter testified that when he arrived, Hickman was lying in bed on his right side, facing the wall with a bullet wound in the back of his head. He also testified that he held a conversation with the defendant that evening in the Hickman apartment. The record is as follows:

"Q. I will ask you whether or not Mrs. Hickman told you where he was when she shot him?
A. She said he was lying there.
Q. Did she say anything as to where she had had the revolver?

A.   I asked her where she kept the gun or where she had the gun. She said under her pillow.

Q.   And did she say anything as to whether or not Mr. Hickman was awake or asleep at the time she shot him?

A.   I asked her about that also, and she said she thought he was sleeping."

Officer Metzger, who took the photographs of the room that evening, testified that there were powder burns on the pillow near the head of George Hickman. Mrs. McDaniel and her daughter, Doris, both testified that that evening after Mr. and Mrs. McDaniel had eaten the evening meal with the Hickmans, and had retired to their own apartment, they heard no noise or commotion of any kind in the Hickman apartment; there was no loud talking evidencing a quarrel and the evidence convincingly proves that there was not a struggle prior to the fatal shooting. There is nothing in the record, not even in the testimony of the defendant, that there had been any overt act on the part of her husband prior to the time she shot him, except her testimony that, as he was lying in bed, he turned over on his right side, throwing his left hand up toward the pillow, at which time she fired the fatal shot.

Are these facts sufficient to warrant the jury in finding the defendant guilty of murder in the first degree? There are many mitigating circumstances which, no doubt, weighed heavily with the jury and resulted in a recommendation of mercy. However, these mitigating circumstances in law do not furnish a justification for the killing. This court does not believe that the facts show that the defendant killed her husband in self-defense. There is ample evidence tending to prove that the defendant purposely and with deliberation and premeditation planned to kill her husband on the day of the murder. We believe that the jury very properly found the defendant guilty of murder in the first degree.

The trial court did not commit error in overruling the defendant-appellant's motion for a dismissal at the close of the state's case. We find that the verdict of the jury is not against the manifest weight of the evidence and is not contrary to law.

The defendant has assigned as error the fact that the court permitted counsel for the state to rebut the defendant on a purely collateral matter. In her direct examination, she was questioned relative to her marriages and divorce. On cross-examination, counsel for the state questioned her rela-

tive to misstatements made as to the marriage license clerk in the Probate Court of Montgomery County, Ohio, at the time she applied for a license to marry George Hickman. In the marriage license records, in answer to the question as to whether she had been married before, the record shows she answered "No". Upon being interrogated on this point, she stated on cross-examination that she did not recall giving that answer. She also stated at the time she applied for her license that she was living on Washington Street, whereas, she was living on Proctor Street. Upon being interrogated on cross-examination on that point, she said she did not remember what was asked. On rebuttal, the marriage license clerk was called and permitted to testify over the objection of counsel for the defendant as to the record and the answers given by the defendant when she applied for a marriage license. Unquestionably, this was a collateral matter. In a criminal case when the witness is cross-examined on collateral matter, the cross-examiner makes the witness his own. **Smith v State, 125 Oh St 137.** See: **Maranda v State, 17 Oh App. 479, 491.** The cross-examiner is not permitted to introduce rebuttal testimony to contradict the witness on a collateral matter. Underhill's Criminal Evidence, 4th Edition, Section 401, Page 808. This rule of evidence is elementary. In permitting the marriage license clerk to testify on rebuttal, the trial court, we believe, committed error. However, the reviewing court, before a reversal can be had, must find that the error was prejudicial to the defendant. The reviewing court is bound to follow the provisions of §13449-5 GC, which so far as it is applicable to this case, is as follows:

"No motion for new trial shall be granted or verdict set aside, nor shall any judgment of conviction be reversed in any court * * * for the admission or rejection of any evidence offered against or for the accused unless it affirmatively appears on the record, that the accused was or may have been prejudiced thereby * * * nor for any other cause whatsoever, unless it shall affirmatively appear from the record that the accused was prejudiced thereby, or was prevented from having a fair trial."

Under the provision of this section, it is mandatory that the reviewing court find from the record that the accused was or may have been prejudiced or was prevented from having a fair trial before ordering a reversal. **State v Huffman, 131 Oh St 27; Makley v State, 49 Oh App 359.** In the latter case, the court on Page 372, says:

"The provisions of this Section are of such character that in order to authorize a reversal of the sentence of conviction for these claimed errors, it must affirmatively appear from the record that the accused was prejudiced thereby or was prevented from having a fair trial."

See also: **State v Moon, 124 Oh St 465, 469; Booker v Cincinnati, 5 O. O. 433; State v Hahn, 10 O. O. 29,** affirmed by the Court of Appeals in **11 O. O. 560** and appeal dismissed by the Supreme Court in **133 Oh St 440; State v Hobbs, 59 Oh App 274,** affirmed by Supreme Court in **134 Oh St 56.**

The rule which controls a court in passing upon error in the record is best stated in **McHugh v State, 42 Oh St 154,** the second part of the syllabus, which is as follows:

"A judgment will not be reversed merely because the record shows error, to which exception was taken. The error, to be sound for reversal, must be prejudicial to the rights of the party complaining, and this is the rule in criminal as well as civil cases."

In **State v Witsel, 144 Oh St 190,** the syllabus is as follows:

"On appeal from a judgment of conviction where the defendant on trial for robbery was asked on cross-examination whether he had committed certain similar offenses, to which questions he objected but on instruction to answer did so in the negative, and the trial court later withdrew such testimony from the jury, it is error, under Section 13449-5, General Code, relating to reversal for improper admission of evidence, for a reviewing court stating **its belief that defendant's guilt was established beyond a reasonable doubt irrespective of such excluded evidence,** to reverse the judgment because of misconduct of the prosecuting attorney in asking such question." (Emphasis Ours.)

In the instant case, we believe the defendant's guilt was established beyond a reasonable doubt. We are convinced the final result would not have been changed had the error not been committed. She stated in her application for marriage license that she lived on Washington Street, when, as a matter of fact, she lived on Proctor Street. However, at one

time she did live on Washington Street. She further stated in her application for marriage license that she was not divorced when, as a matter of fact, she had been divorced. However, this court is of the opinion that the physical facts surrounding the killing, together with the conduct and statements of the defendant, are so convincing with respect to the manner in which the defendant planned and executed her purpose and that the verdict of the jury is supported by such ample proof, that the verdict would not have been different had the error not been committed.

After giving due consideration to all of the evidence in this case and the error complained of, this court conscientiously feels that the misstatements made in the marriage record being of an irrelevant nature and not of an influential character, the jury was not influenced by this testimony in arriving at its verdict. Taking this view of the case, the court finds that the trial court did not commit prejudicial error by permitting the marriage license clerk to testify in rebuttal on a collateral matter.

Defendant further contends that the trial court erred in refusing counsel for the defendant the right to inspect a written statement in the possession of Officer Metzger, a witness for the state, after the witness had referred to said written statement while on the witness stand for the purpose of refreshing his memory. The record shows that while Officer Metzger was testifying and while the jury was looking at certain photographs which had been introduced into the record, he, Officer Metzger, was looking through certain typewritten statements in a folder which he had brought with him from police headquarters. In answer to a question as to whether he was referring to the statements for the purpose of refreshing his memory, his answer was in the affirmative. However, later in his testimony, he stated that he had not refreshed his memory, and that he had not made any statement to the jury from any record which he had with him on the witness stand. The court finally asked him the question as to whether he used the typewritten statements to refresh his memory, to which he answered as follows:

"There is nothing in these will answer any questions he asked. No information that will add to the answer of any of the questions."

The court sustained the objection of counsel for the state

458

and did not permit counsel for the defendant to examine the records. In this ruling, we do not believe that the trial court committed prejudicial error.

The court believes that the defendant had a fair trial; that there is no prejudicial error in the record and that the judgment of the trial court should be affirmed.

HORNBECK, P. J., and MILLER, J. concur.