Commonwealth *v.* Neill, Appellant.

508

Argued April 11, 1949. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

*Harry M. Berkowitz,* for appellant.

*Emanuel W. Beloff,* Assistant District Attorney, with him *John H. Maurer,* District Attorney, for appellee.

OPINION BY MR. JUSTICE HORACE STERN, June 24, 1949:

Defendant appeals from a conviction of murder of the first degree with the penalty of death. Notwithstanding an intensive study of the record commendably made by his counsel in order to detect and expose errors committed by the court below, we are not convinced that there were any of sufficient importance to justify, much less require, the granting of a new trial.

Defendant is a young man twenty-two years of age. From his earliest youth he has lived an extremely unsettled life. He attended elementary public schools and junior high school in Philadelphia but ran away from home several times during that period and was finally transferred to a disciplinary school; the psychological

clinic attached to that school found him to be an "unstable, socially maladjusted boy". After going away to the west coast he worked, first at ranching, then at a succession of different jobs, and then on ships of the merchant marine. In Texas, at the age of 17, in 1942, he enlisted in the United States Marine Corps and was shortly thereafter sent with replacements to Guadalcanal and the Pacific theatre of the war, where he became engaged in active combat service and had several harrowing experiences. He contracted a severe case of malaria and was hospitalized in New Zealand as a casualty because of this illness and combat fatigue. On his return to the United States he was invalided out of the service with an honorable discharge. The next few years of his life were marked by a succession of temporary jobs, marriage at 18 to a woman six years his senior, quarrels with her which resulted ultimately in divorce, disagreements with various members of his family, and, in general, a postwar restlessness. He had several recurrent attacks of malaria and was admitted at intervals to Naval and Marine Hospitals in San Francisco, Philadelphia and San Diego. He again entered upon service in the merchant marine; this brought him to foreign countries, but he afterwards left the sea and, during the summer of 1947, worked on a farm; toward the end of that summer he had in mind to go once more to the west coast, but, preparatory to departing, he visited the home of his sister, Mrs. Mallon, in the Kensington district of Philadelphia, principally in order to obtain some money which belonged to him and of which she was acting as custodian. It was at this point that the crime was committed which is the subject of this appeal.

The facts, briefly stated, are as follows: One of his sister's children was a young girl, Isabella, not quite 12 years of age. At about 5.30 o'clock on Saturday afternoon, September 6, her mother gave her some money to go out and buy herself a pair of socks; defendant,

stating that he wished to purchase a polo shirt, left the house with her. According to his testimony he had been for some time "jumpy and nervous", was suffering from headaches, and had been drinking to some extent. After strolling with Isabella for a while along Kensington Avenue and eating with her at a restaurant he offered to take her to a place where she could ride a pony, at which suggestion she "jumped with joy". They entered a taxi-cab and, at his direction, were driven to the athletic field of a boys' club at Front Street and Erie Avenue. but, finding the gates of the field closed, they walked north together to Luzerne Street, east to Whitaker Avenue, and then down the latter toward Erie Avenue again. At that point, on the east side of Whitaker Avenue, there is a large open lot some 1300 feet long by 450 feet wide of which the southern end was used by boys as a baseball field but the greater portion was in the nature of a pathless waste of rough terrain covered thickly with bushes and weeds of a height of from 4 to 6 feet. Telling Isabella that he would show her the place where he used to play baseball as a boy, defendant climbed with her the five foot elevation which led up to this lot and traversed it for a distance of some 300 feet or more toward the railroad tracks which skirted its eastern border. The facts thus stated and those which describe the subsequent happenings are derived entirely from defendant's written confessions. He began violently to hug and kiss Isabella; she objected; he says that he became intensely passionate; she lay on the ground on her back amid the thick weeds; he cannot recall whether she did this at his proposal but he "guessed" that he suggested it. He lay beside her, caressing and fondling her in a lewd manner and taking indecent liberties with her person; he intended to ask her to relieve his passion "in same way or other"; he does not remember whether or not his person was exposed. Mean-

while she had started to cry and scream, and, according to a statement made in his confessions, she threatened to tell her parents, whereupon he became frightened, put his hand over her mouth and "the next thing he knew" he was choking her with both his hands and she was gasping for air and bleeding from the nose. In his testimony at the trial he said he did not know whether she did threaten to tell her parents, and he intimated that his former statement to that effect had been elicited by pressure on the part of his interrogators. When he released his hands, and she lay limp and motionless, he said that he realized what he had done; he fled from the scene, stopped at a bar for drinks, washed some blood from his face, and then wandered back to his sister's house where he arrived between 7.30 and 8.00 o'clock in the evening. He said nothing to his sister or to any members of the household as to what had happened but gave an equivocal answer to their inquiries as to what he knew of Isabella's whereabouts; he washed, shaved, changed his shirt, and then left and went to a farm in Maryland where he took employment and where he was subsequently apprehended. The body of Isabella lay on the lot undiscovered for 13 days; it was then found, in the midst of weeds 4 to 6 feet high, in an advanced state of decomposition.

The court instructed the jury that defendant was guilty of murder of the first degree if he committed the crime either with premeditation or during the course of an attempt to commit rape. The principal contention now urged by defendant's counsel is that, although the evidence admittedly disclosed an indecent assault, it did not establish an attempt to commit rape. It is true, of course, that, to constitute such an attempt, there must be not only an intent but also some overt act which seeks to carry that intent into execution. It is also true that the term "rape" as used in the murder statute is limited to rape at common law and does not include

statutory rape: *Commonwealth v. Exler*, 243 Pa. 155, 158-160, 89 A. 968, 969, 970. But, taking the facts as to what occurred from defendant's confessions, from his testimony on the witness stand, and from all the surrounding circumstances, we have no hesitation in concluding that the evidence was amply sufficient to permit a jury to infer that it was not only defendant's intention to commit rape if he could not gain Isabella's voluntary consent to sexual relations, but that, knowing from her attitude toward his caresses that he could not possibly obtain such consent, he proceeded by overt acts of aggression to accomplish his purpose. Indeed if, as he testified, he was not certain whether she threatened to tell her parents, his choking her might well have been, not for the purpose of silencing her, but in furtherance of a frenzied attempt to overcome her resistance to his attack. In *Commonwealth v. Prenni*, 357 Pa. 572, 574, 575, 55 A. 2d 532, 533, it was held on testimony much weaker than the present that the jury was warranted in drawing the inference that an attempt had been made to commit rape and that there was enough evidence to support a finding that the death of the victim resulted from an attempt to force sexual intercourse with her against her will.

The sole defense offered by defendant was that of insanity but the evidence on that question favorable to defendant was extremely unconvincing. An expert witness testifying on his behalf expressed the opinion that he suffered from a "recurrent confusional insanity" that lasted, however, only for the time that elapsed between his fondling the child and his becoming conscious that he had his hands around her throat and she was bleeding from the nose; thereupon he regained his sanity and ran from the scene of the crime. Apart from the fact that "confusional insanity" is apparently an antiquated and discarded theory and that the proposition that there could be such a thing as a momentary

insanity was sharply challenged by an expert witness for the Commonwealth, it would seem quite obvious that defendant's witness failed to differentiate between a mere temporary frenzy or emotional excitation, and insanity within the legal meaning of that term, namely, inability, from disease of the mind, to understand the nature and quality of the act and to distinguish between right and wrong with respect to it: *Commonwealth v. Szachewicz*, 303 Pa. 410, 416, 417, 154 A. 483, 484, 485; *Commonwealth v. Lockard*, 325 Pa. 56, 60, 188 A. 755, 757.

The Commonwealth produced three expert witnesses who were firmly of the opinion that defendant was sane at all times before, during and after the commission of the crime. In a communication submitted by two of them to the District Attorney as a result of their examination of defendant prior to the trial they stated that, "although of normal average intelligence," he "manifests a profound psychoneurosis with marked emotional instability colored by severe chronic malaria," and that "the commission of this act of violence can be explained as an impulsive act on the basis of his profound psychoneurosis, marked emotional instability and severe chronic malaria, which factors can be considered therefore as extenuating circumstances." Defendant's counsel asserts that, had he been informed of this report, he might, in his cross-examination of these witnesses, have brought these circumstances to the attention of the jury. In that same report, however, these witnesses had stated, as categorically and confidently as they did on the witness stand, that, in their opinion, defendant at the time of the commission of the murder was in possession of his mental faculties, was not insane, knew right from wrong, and was therefore legally responsible for his act. Certainly neither social maladjustment, nor lack of self-control, nor impulsiveness, nor psychoneurosis, nor emotional instability, nor chronic malaria,

nor all of such conditions combined, constitute insanity within the criminal-law conception of that term. As to the possible effect the presentation of the witnesses' report might have had on the jury with respect to the imposition of the penalty, it is sufficient to say that all the facts in regard to defendant's drinking, headaches, malaria, maladjustment, nervousness and psychoneurosis were brought out at length, partly in his own testimony, partly in that of his witnesses, and partly from portions of public records admitted in evidence. It might be added that although defendant's counsel asked one of these expert witnesses whether he had given the District Attorney's office a report of his examination he did not press for an answer nor pursue the inquiry to a conclusion, neither did he ask to see the notes which the witness had made during his examination of defendant and which he had with him on the witness stand. It has never been considered, nor held to be, the duty of a District Attorney, in the absence at least of a request, to exhibit a private communication or "report" of his expert witnesses to defendant's counsel, any more than it would be his duty to acquaint opposing counsel with conversations or communications, oral or written, which he might have had with any other witnesses called on behalf of the Commonwealth.

There are several assignments of error to rulings of the court concerning the admission or rejection of evidence. The psychiatrist who testified on behalf of defendant was not present during the trial to hear the testimony offered by the Commonwealth, and, because of that fact, the court apparently thought that this witness should not be allowed to express his opinion in regard to defendant's sanity unless there were framed and presented to him a hypothetical question covering all the evidence in the case. It is well settled that an expert who has made a personal examination of a defendant may express his conclusions on the basis of

such examination alone, hypothetical questions being necessary only where no such personal examination has been made by the witness, although they may, of course, be employed, if it be deemed desirable, to supplement such examination: *Commonwealth v. Gibson,* 275 Pa. 338, 341, 119 A. 403, 404; *Commonwealth v. Logan,* 361 Pa. 186, 195, 196, 63 A. 2d 28, 32. However, there was no harm done in this case by the view initially taken by the court because the witness was finally allowed to express his opinion at length on the basis of both his examination and the summary of the testimony narrated to him by counsel.

One of the assignments of error is directed to the court's restriction of the admission in evidence of certain public records concerning the medical and psychological history of the defendant—records of the Board of Education, of the Travellers' Aid Bureau, and of the Veterans Administration. These records might well have been admitted, but their partial exclusion worked no substantial damage to defendant because all the material portions of their contents were brought out in the testimony of defendant himself or of other witnesses.

Defendant's brother was questioned as to what he observed concerning defendant's conduct, and what his experiences with him were, while defendant was once staying with him on his farm. He testified that defendant was very nervous and he recounted some incidents by way of illustration. In cross-examination by the District Attorney he was asked whether he had not made certain statements derogatory to defendant's morals; upon his denying having done so the Commonwealth, in rebuttal, presented testimony that he had in fact made such statements, to wit, that defendant had indulged on one occasion in a lascivious kissing of his married sister, had undressed a three year old daughter of his brother at bedtime and tried to teach her to "shimmy", and had "molested" a fourteen year old daughter of a neighbor-

ing farmer. This was offered in order to discredit the brother's testimony in chief. While it should have been excluded because it involved contradiction of the witness on a merely collateral matter, the error in receiving it in evidence was harmless in view of the fact that defendant admitted having made lewd advances to his victim, and therefore it did him no injury to show that he was of a lascivious nature.

Finally, it is complained that the learned trial judge allowed the District Attorney to ask an improper and prejudicial question on cross-examination of the defendant. The District Attorney "suggested" to defendant that when Isabella was on the ground he attempted to commit an act of sexual perversion. The fact that instead of this being propounded in the usual form of an interrogatory the District Attorney said "I suggest to you . . ." is certainly of no importance; in English courts it is not unusual to present in that manner what are intended merely as questions and are so understood. But the question itself, irrespective of its form, was highly reprehensible, because there was nothing whatever in the testimony to indicate that any such offense had been committed or attempted. However, the learned trial judge, in vigorous language, admonished the jury to expunge from their minds what had thus been intimated, and cautioned them to give no credence to it but to exclude it wholly from their consideration. The test in such cases is whether the jury may have been so strongly influenced by the improper introduction of such an insinuation that the effect of it on their minds could not likely be dispelled by the court's subsequent instruction to disregard it: *Commonwealth v. Fugmann,* 330 Pa. 4, 17-20, 198 A. 99, 106, 107. In the present instance we do not believe that the jury could have been so influenced, for they must immediately have realized that there was no basis for the District Attorney's "suggestion". Be this as it may, it is safe to conclude that,

in view of the established, even admitted, atrocity of the crime, this incident was not a contributing factor in the determination of the penalty.

Reading the record in all its gruesomeness leads inevitably to the conclusion that the verdict was wholly justified. The crime was singularly abnormal and shocking. A visitor in his sister's home, defendant took advantage of the confidence reposed in him by this young, innocent and trusting girl who naturally looked with respect and admiration upon her soldier uncle. If not at the very time he started from the house at least at some point in his stroll with her he must have conceived the design which he afterwards carried into execution, because there could have been no other reason for his luring her to a desolate spot and there taking her into the dense bushes that covered the lot where he perpetrated his crime. After seeking satisfaction of his lust he murdered her cruelly and repulsively by strangulation, and then, with almost incredible callousness, left her body exposed to decomposition by the elements, calmly rejoined his sister and her family, evaded their queries as to the child's whereabouts, left the city for a concealed destination, occupied himself for 16 days on a farm until he was apprehended, and during all that time gave no concern whatever to the decent disposition of the child's body or to the anxiety of the parents caused by her disappearance. The jury, impressed, as they must have been, by these circumstances, imposed the penalty of death and, since it is they in whom the statute vests discretion to fix the penalty, it is not for this Court to review their decision.

Judgment and sentence affirmed.

---

CONCURRING OPINION BY MR. CHIEF JUSTICE MAXEY:

That there was error committed in the trial of this case is obvious. The question is whether or not this error was so substantial as to deprive the defendant of

a fair trial. We pointed out in *Commonwealth v. Fugmann*, 330 Pa. 4, 18, 198 A. 99, that: "There is seldom any criminal or civil trial of any magnitude or duration into the record of which some irrelevant, incompetent and immaterial testimony does not 'creep' . . . To grant new trials whenever such a thing occurred would mean an interminable and intolerable succession of new trials."

In *Commonwealth v. Barnak*, 357 Pa. 391, 419, 54 A. 2d 865, this Court said: "Taking an appeal in criminal cases is not a game in which the appellant wins if he can show that the trial judge fell a few degrees short of perfection in the conduct of his trial. This court has consistently refused to reverse convictions of murder in the first degree, even with the death penalty imposed, for errors in the conduct of the trial or in the admission of evidence or in the judge's charge, when these errors did not deprive the defendant of the fundamentals of a fair trial."

In the case now before us it is not disputed that the defendant killed his niece, a girl under 12 years of age. Neither can there be any doubt of the defendant's guilt of murder in the first degree, whether he attempted to rape the child or not. According to his own statement he, a man then over 21 years of age, "put his hand over her mouth" and he "choked her with both his hands". Since every one is presumed to intend the natural and probable consequences of his acts, the inference is reasonable that when this man choked this child he intended to kill her and he is therefore guilty of murder in the first degree. The only possible defense remaining to him was the defense of insanity. That issue was fairly tried and the finding was adverse to the contention. Three expert witnesses testified for the Commonwealth that the defendant was sane at all times before, during and after the commission of the crime. His conduct and his flight after the commission of the crime is also indicative of his sanity.

The defendant's counsel complains that the District Attorney did not submit to defendant's counsel a pre-trial communication to the District Attorney from two of the expert witnesses called by the Commonwealth, in which communication they said the defendant "although of normal average intelligence, manifests a profound psychoneurosis with marked emotional instability", etc. Defendant's counsel asserts that if he had been informed of this report he might at the cross-examination of these witnesses have brought out these circumstances to the attention of the jury. A District Attorney is under no obligation to acquaint a defendant's counsel with all his oral or written communications with expert witnesses or other witnesses whom he proposes to call in the trial of a criminal case. Of course, if he should discover some fact which would militate in the defendant's favor it would be his moral and legal duty to bring this to the jury's attention, either directly or by permitting defendant's counsel to do so, for the District Attorney is a quasi-judicial officer. In the instant case there was nothing in the communication referred to which vitiated the evidence the defendant gave in court to the effect that defendant at the time of the commission of the murder was in possession of his mental faculties, was not insane and knew right from wrong and was, therefore, legally responsible for his act.

The defendant complains that when the defendant's brother was on the stand he was cross-examined by the District Attorney as to whether or not he had not made certain statements derogatory to defendant's morals and upon his denial of having done so the Commonwealth in rebuttal presented testimony that he had made such statements. The admission of this rebuttal testimony was clear error, but it was not prejudicial. In *Commonwealth v. Petrillo*, 341 Pa. 209, 224, 19 A. 2d 288, we discussed the principle that there can be no contradiction permitted on collateral matters. We there cited Wigmore on Evidence, 3rd ed., Vol. 3, page 657,

sec. 1003, which reads as follows: "The only true test [of 'collateralness'] is that laid down in *Attorney-General v. Hitchcock*, 1 Exch. 99 Pellock, C. B. 'Could the fact, as to which error is predicated, have been shown in evidence for any purpose independently of the contradiction?'" In the instant case the "rebuttal evidence" was clearly incompetent, for the reason that the cross-examining district attorney would not have been entitled to offer the evidence in support of his case: (See cases cited in 1947 Pocket Supplement to Vol. 3, Wigmore on Evidence, (3rd ed.), section 1003.) It was therefore a contradiction on a collateral matter. But, it did the defendant no harm for the following reason: Defendant by his own statement as to what he did just before he murdered his victim showed that he had indulged in grossly lascivious conduct. *Having admitted that fact* he was not injured by evidence that on other occasions he had indulged in like conduct. If his lascivious conduct at the time of the homicide had been a fact in issue the admission of the "rebuttal testimony" would have been prejudicial error. Since it was not a fact in issue but a fact admitted, the testimony was harmless.[1]

---

[1] In the administration of justice in criminal cases the rule that no new trial shall be granted for the erroneous admission or rejection of evidence unless such admission or rejection has been prejudicial to the defendant, is provided by statutes in some states. In our own and many other states the rulings of the highest court are to that effect. In *State v. Hickman*, 67 N. E. 2d 815, the Court of Appeals of Ohio in passing upon the effect of the admission of rebuttal evidence on a collateral matter, said, after adjudging the evidence to be *not* prejudicial: "In a criminal case when the witness is cross-examined on collateral matter, the cross-examiner makes the witness his own. . . . The cross-examiner is not permitted to introduce rebuttal testimony to contradict the witness on a collateral matter." The Court then cited the provisions of Section 13449-5 of the General Code of Ohio, which reads as follows: "No motion for a new trial shall be granted or verdict set aside, nor shall any judgment of conviction be reversed in any court . . . for the admission or rejec-

The defendant also complains of the question which the District Attorney "suggested" to defendant and which relates to an alleged act of perversion. This suggestion was highly improper and the trial judge should not have permitted it. However, the judge did instruct the jurors to exclude it wholly from their consideration. While it is unfortunate that in the trial of any case certain incompetent evidence may be admitted which later the trial judge is obliged to instruct the jury to disregard, the practical administration of justice does not permit the granting of new trials every time such an incident occurs. An example of this is found in *Commonwealth v. Fugmann*, supra. There the court admitted in evidence as a res gestæ declaration a statement by the victim, which statement inculpated the defendant. The court when later realizing its error, instructed the jury to disregard the evidence. In holding that this instruction to the jury cured the error we said that "To grant new trials whenever such a thing [i. e. the admission of incompetent testimony later struck out] occurred would mean an interminable and intolerable succession of new trials." We also said: "it must be taken for granted that the jury obeys the instruction [to disregard the testimony] and that therefore the admission of what was legally inadmissible evidence was *harmless* error." So in the instant case we must take it for granted that the court's instruction to the jurors to exclude from their consideration the improper suggestion which the District Attorney made in reference to

tion of any evidence offered against or for the accused unless it affirmatively appears on the record that the accused was or may have been prejudiced thereby . . . nor for any other cause whatsoever unless it shall affirmatively appear from the record that the accused was prejudiced thereby or was prevented from having a fair trial."

In *Commonwealth v. Kline*, 361 Pa. 434, 65 A. 2d 348, the defendant's abnormal conduct was *the* fact in issue, and the evidence admitted was competent to prove it.

an alleged act of perversion by the defendant, was obeyed.

Being convinced that this defendant is guilty of murder in the first degree in choking this 12 year old child to death (whether or not the choking was a part of an attempted rape of the child) and being further convinced that the defendant was legally sane at the time he committed the crime and believing that the errors complained of did not amount to a denial of the fundamentals of a fair trial, I concur in the affirmation of the judgment and sentence of the court below.

DISSENTING OPINION BY MR. JUSTICE JONES:

The sordid and revolting nature of the appellant's conduct attending the commission of the crime whereof he now stands convicted was so violative of ordinary standards of decency and morality that, in reviewing his trial, one must be on guard lest revulsion displace reason and, so, blind one to the possible presence of harmful error. It, of course, goes without saying that, insofar as crimes may be expiated by penalties imposed upon the guilty by judgments at law, it is essential at all times that such judgments truly reflect impartial administrations of the law regardless of the baseness of the particular offenders. The integrity and permanence of the social order require as much; and no criminal can be such a pariah that less can suffice.

It is my opinion that there was error in the trial of this case so fundamental that the ensuing sentence of death, under which the appellant now abides, stands tainted with disqualifying legal fault which can be obviated only by a re-trial conducted in strict compliance with established principles of law.

The defense was insanity. Obviously, anything relevant and material to that issue that would go to support the defense or contradict or minimize the testimony

*contra* produced by the Commonwealth should have been received in evidence. And, yet, because of a certain situation, whereof the district attorney was fully cognizant and which he could have readily corrected, pertinent matter favorable to the defense did not get in evidence. Because of that and other errors, to which I shall refer, the trial, to my mind, was less than fair and impartial.

The majority opinion states the facts with marked fairness to the defendant. But, I think it is also important to add that the defendant's combat fatigue, which the majority opinion mentions, developed into a definite psychoneurosis and that either on account of that mental condition or the malaria, which he had also contracted in the southwest Pacific, or both, he had been hospitalized in Wellington, New Zealand, in the United States Marine Hospitals at San Diego and San Francisco, California, and in the United States Naval Hospital at Philadelphia. He was invalided out of the Navy in August 1943 and received at that time an honorable discharge with notation of disability of forty per cent for neuropsychiatric disorder and ten per cent for malaria.

On the issue of the defendant's sanity, the Commonwealth called in rebuttal two eminent psychiatrists, Dr. Ornsteen and Dr. Keyes. Under order of court, obtained by the district attorney, these doctors were employed to examine the defendant's mentality, which they did on two different occasions in Moyamensing Prison a month prior to the trial. Following these examinations, they made an extensive *written*, and signed, report of their findings to the district attorney. The existence of such a report was unknown to defendant's counsel throughout the trial. He did not discover it until he happened to come upon it among the file of papers, constituting the record on this appeal, sent up by the clerk of courts pursuant to our certiorari. Defendant's coun-

sel then had the report printed in a separate paper book
for our information. The crucial materiality of the re-
port to the issue raised by the defense and the defend-
ant's right to its production at trial for introduction in
evidence, I shall endeavor to show.

Dr. Ornsteen, being asked on cross-examination when
he had formulated his opinion as to the defendant's
sanity, answered,—"A conclusive opinion, at the end of
the testimony I heard." The cross-examination then con-
tinued as follows: " Q. Did you render any previous
opinion? A. I did not, except in conferences, *verbally*.
Q. With whom? A. Mr. Beloff [district attorney].
Q. Was that before the trial? A. Yes, after examina-
tion. . . . Q. You did have a conference with Mr. Beloff
prior to the trial, and at that time did you render an
opinion? A. A *verbal* opinion, during the conference,
several days after the visit to Moyamensing Prison."
(Emphasis supplied.) The import of the doctor's testi-
mony to the effect that his report to the district attorney
of the results of his examination of the defendant in
Moyamensing Prison, a month prior to the trial, was
verbal was *not* in accordance with the facts. Yet, the
district attorney neither then nor later made any effort
to have the error corrected although, as he conceded at
the bar of this Court, he was present throughout the
cross-examination and "must have heard" the interro-
gation by defendant's counsel in such connection and
the witness's misleading implication as to the form of
all of his reports to the district attorney. I agree that
it is not incumbent upon a district attorney to make out
a defense for an indictee, but I do not agree that he can
sit by silently and virtually suppress matter material
to the issue and helpful to the defendant on trial which
is in his possession and control. Had the existence of
the written report been developed in the course of Dr.
Ornsteen's cross-examination, as it should and would
have been had the district attorney been punctilious to
correct the doctor's evident misintendment, the existence

of the written report would have at once become known and defendant's counsel could then have called for its production; the relevancy and materiality of the written report to the defense of insanity and, *at least,* to the penalty in case of a first degree conviction would have immediately become apparent.

Thus, under the heading *"Opinion"* in the written report, Doctors Ornsteen and Keyes attested that,— *"It is the opinion of Dr. Ornsteen and Dr. Keyes that George A. Neill, although of normal average intelligence, manifests a profound psychoneurosis with marked emotional instability colored by severe chronic malaria.*

"It is further the opinion of the examiners that although George A. Neill, at the time of the commission of the murder on September 6, 1947, to which he has confessed, was in possession of his intellectual faculties, was not insane, knew right from wrong, and was therefore responsible before the law for his act.

*"However, it is also the opinion of ·the examiners that the commission of this act of violence can be explained as an impulsive act on the basis of his profound psychoneurosis, marked emotional instability and severe chronic malaria, which factors can be considered therefore as extenuating circumstances."* (Emphasis supplied.)

When these doctors testified at trial, the sum and substance of their testimony was that, at the time of the commission of the crime, the defendant was in possession of his mental faculties, knew the difference between right and wrong, was capable of acting on that knowledge and was not insane. In other words, their opinions at trial embraced, in substance, *only* the un-italicized portion of the above-quoted opinion as contained in their report. Not once did they allow for *any* effect from the "profound psychoneurosis, marked emotional instability and severe chronic malaria" upon the

defendant's mentality in its relation to the commission of the offense as they had done in the above italicized portions of their formal written report.

With reference to the written report of the doctors, the majority opinion, after quoting certain excerpts from the portions hereinabove italicized, dismisses the possibility of any harm to the defendant from the fact that the report was not made known to defendant's counsel appropriately and timely or received in evidence. The majority consider the matter not to have been harmful to the defendant because these witnesses expressed an opinion in the written report as to the defendant's sanity. Of course they did,—the same as they testified to at trial, as already stated; it is quoted in full in the above unitalicized portion of the report. But, it is my opinion that whether the report would have been helpful to the defendant in fact was *for the jury*, and not for a court, to determine. Nor was the harm, which resulted from the very effective, even though unintentional, suppression of the doctors' report, atoned, as the majority opinion suggests, by the fact that the matters therein contained ". . . in regard to defendant's drinking, headaches, malaria, maladjustment, nervousness and psychoneurosis were brought out at length, partly in his own testimony, partly in that of his witnesses, and partly from portions of public records admitted in evidence." It takes but slight realism to appreciate that the persuasive effect of the evidence from such sources, which the defendant produced, was *nil* compared with the weight the above-quoted italicized portions of the opinion of the Commonwealth's learned experts would have had with the jury.

A further serious error consists of the following. The defendant called as a witness, in his own behalf, his brother, William, for whom he had formerly worked. In cross-examination, the district attorney asked William whether he had not told Mr. and Mrs. Mallon (his brother-in-law and sister) that he had gotten rid

of George (the defendant) because of certain then specified moral delinquencies. William flatly and categorically denied that he had ever told the Mallons anything of the sort. In rebuttal, the district attorney called Mr. and Mrs. Mallon for the purpose of contradicting *William* in the premises. The proffered testimony was, of course, hearsay as to the defendant; and, as it bid to introduce collateral matter highly prejudicial to him, his counsel properly and strenuously objected to its admission. Yet, the trial judge permitted the witnesses to testify to the *things which they said William had told them and which William had denied.* In objecting to Mr. Mallon's testimony in this regard, the following colloquy took place between defendant's counsel and the court: "Mr. Berkowitz [defendant's counsel]: If your Honor please, I don't wish . . . The Court: Don't interrupt the witness. Mr. Berkowitz: This is in his absence. The Court: Where is the defendant? He is here. Mr. Berkowitz: The statement was made in the absence of the defendant. The Court: The brother William testified in your case. Mr. Berkowitz: That is right. The Court: This is rebuttal. Mr. Berkowitz: Rebuttal, contradicting William? The Court: That is right."

With it thus apparently settled that the effect of the refutation went no further in any event than to contradict the witness William, observe the erroneous use to which this testimony was put by the trial judge in his charge to the jury as follows: "Then we had the other witnesses who were brought in to refute some of the testimony of the *defendant* [sic] in which he denied certain things that had been testified to with regard to, for instance [the alleged indecencies of the defendant, recited by the Mallons as having been told them by William], and one thing and another, which he had denied. All those things were brought to your attention, and also the fact that he admitted he had lied on the stand in a number of instances, and the fact that he

undoubtedly had lied on a number of occasions. For instance, he must have lied, of course he lied to his sister when he came back from the lot when he told her the last time he saw the little girl was on Kensington avenue when, as a matter of fact, he had left her strangled on the lot. There were many instances of lying that he admitted." (Emphasis supplied.) Aside from the very obvious error in allowing *refuted hearsay* to go to the jury as substantive proof of the matter therein contained, an even more egregious error lies in the fact that the trial judge submitted the hearsay of the Mallons to the jury as impeachment of denials *by the defendant* of the lewd and lascivious conduct attributed to him by the hearsay. *The plain and ineradicable fact is that the defendant was never interrogated, nor did he testify, throughout the trial, either in direct or cross-examination, in regard to such matters; nor were the Mallons called to refute him.* This error is so palpable as not to require further comment. Yet, the majority opinion appraises it as harmless.

The trial judge also erred in excluding the defendant's hospital records which the Veterans' Bureau in Philadelphia produced pursuant to a subpœna issued by defendant's counsel. Such records embraced the defendant's hospitalization in New Zealand and in the government hospitals in this country already mentioned. Those records contained matter pertinent to the defendant's mental condition at various times in the years immediately preceding the commission of the crime. The trial court mistakenly ruled out the records produced by the Veterans' Bureau on the ground that they had not been certified as required by Act of Congress (49 Stat. 1105, 38 USCA §11g.) as a prerequisite to their competency in evidence. What defendant's counsel had actually offered were the *original* records (not copies) from the office files of the Veterans' Bureau in Philadelphia. The Act of Congress, cit. supra, presupposes the

admissibility of original records; when copies are certified, they become equally admissible with the originals. With the authenticity of the proffered records as originals, they were especially admissible on the basis of the competency afforded by our own Uniform Business Records as Evidence Act of May 4, 1939, P. L. 42, 28 PS §91b. The majority opinion concedes that "These records might well have been admitted . . .", but, here again, excuses their exclusion as *harmless* error "because all the material portions of their contents were brought out in the testimony of defendant himself or of other witnesses." It indeed taxes one's imagination to suppose that anything the defendant or his witnesses testified to concerning his mental impairment could possibly approach in weight and persuasiveness the excluded official government records. To my mind, the court's action wrongfully deprived the defendant of a substantive right; and the matter consequently involved more than a mere exercise of judicial trial discretion.

There is one further matter to which I shall refer and which the majority opinion concedes was error but holds that it was absolved by action of the trial judge to that end. I do not think that the harm was so facilely eliminated. All of the facts concerning the occurrences in the field where the unfortunate little girl met her untimely and tragic death came from the defendant himself in statements he gave police officers, the examining doctors and on the witness stand. Nonetheless, the district attorney, in his cross-examination of the defendant, imputed to him a dastardly act of perversion for the support of which there was not a single word of producible proof. The district attorney had prefaced his question with "I suggest" in the apparently mistaken belief that an attorney may insinuate anything into a case in cross-examination so long as he introduces his improprieties by "suggesting". The majority opinion appropriately condemns such misconception of an ad-

vocate's proper role. The defendant's counsel made timely and vigorous objection which the trial judge overruled with remarks designed to substantiate that there *was* argumentative basis in the record for the suggestion. Thus, in the first instance, the court actually aggravated the district attorney's offense. But, on the succeeding day, at the close of the defendant's case, the court, after a side-bar conference with counsel, again took up the matter with the jury by referring to what had transpired in such regard the previous day and, then, by reading to the jury from the two-page colloquy between the court and counsel the day before.

The court opened the matter by saying,—"Members of the jury, at the session yesterday, while the defendant, George Neill, was on the stand under cross-examination by Mr. Beloff, the District Attorney, Mr. Beloff addressed himself to the defendant as follows." The court then reread the district attorney's admittedly improper question of the day before. Immediately following that, the court assumed to interpolate the following gratuitous observation: "That question was not answered. You will recall the witness sat with bowed head, with his head in his hands, for quite a long time, and then the question was not pressed, but Mr. Berkowitz then . . . [moved for the withdrawal of a juror]." The court resumed reading from the transcribed colloquy, including his own unwarranted recapitulation of the day before of the evidence which he had then thought justified the improper question, and concluded the reading of the record as follows: "Then Mr. Beloff said:—no, Mr. Berkowitz said: 'I except to your Honor's recapitulation of what the District Attorney said and I ask for the withdrawal of a juror.' The Court said: 'It is refused.' Mr. Berkowitz then asked for an exception which was granted." When the reading of the long colloquy with interpolations had thus been concluded, the court told the jury,—"*That* part of the record I now

direct to be stricken from the record, and I am instructing you to disregard *that* part of *it* in coming to any conclusion in this case. You should expunge *it* from your minds entirely and give no credence to *it* in any way, shape or form, in coming to any conclusion you may come to in this case. You are to exclude *it* from your consideration." (Emphasis supplied.) In the maze of what had gone before over two days of trial, it requires more naïveté than judges or lawyers normally display in order to believe that the jury had any idea of what the court meant by *"that"* and *"it"* or what was to be eliminated from the record; and it requires still more credulity to believe that the jury could honestly accomplish the required metaphysical feat, especially after the court's repetition of the, now conceded, harmful matter of the day before.

I would reverse the judgment and sentence and remand the case for a re-trial.