James F. TORRANCE, Plaintiff,

v.

Joseph SALZINGER, Warden of the Dauphin County Prison, and Wesley M. Barrick, Sheriff of Dauphin County, Pennsylvania, Defendants.

No. 397.

United States District Court
M. D. Pennsylvania.

June 30, 1961.

As Amended July 7, 1961.

Elder W. Marshall, Gilbert J. Helwig, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., F. Brewster Wickersham, Harrisburg, Pa., for petitioner.

Anne X. Alpern, Atty. Gen., Martin H. Lock, Dist. Atty. of Dauphin County, Harrisburg, Pa., Huette F. Dowling, Sp. Deputy Atty. Gen., Alfred P. Filippone, Deputy Atty. Gen., for respondents and Commonwealth of Pennsylvania.

William Lipsitt, Harrisburg, Pa., for Wesley M. Barrick.

FOLLMER, District Judge.

This is an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The petitioner is presently at large on bail by Order of a Circuit Court Judge pending the disposition of this matter.

On June 5, 1958, petitioner was sentenced to undergo imprisonment in the Dauphin County, Pennsylvania, prison for consecutive sentences of not less than one nor more than two years pursuant to a verdict of guilty entered on July 24, 1957, in said Dauphin County Court of Quarter Sessions on two separate indictments charging:

1. Conspiracy to cheat and defraud the Pennsylvania Turnpike Commission.

2. Misbehavior in office.

Petitioner appealed to the Pennsylvania Superior Court which affirmed his conviction except as to one count in the misbehavior in office indictment, Commonwealth v. Evans, 190 Pa.Super. 179, 154 A.2d 57. The Pennsylvania Supreme Court granted allocatur but affirmed the conviction, 399 Pa. 387, 160 A.2d 407.

Petitioner then made application to the Supreme Court of the United States for writ of certiorari which was denied November 21, 1960, 364 U.S. 899, 81 S.Ct. 233, 5 L.Ed.2d 194, and a rehearing was denied January 9, 1960, 364 U.S. 939, 81 S.Ct. 377, 5 L.Ed.2d 371.

In his original and supplemental petitions, petitioner alleges that he was denied due process of law and equal protection of the laws guaranteed by the Fourteenth Amendment to the United States Constitution in eight respects which were set forth in Paragraph 5 of the petition and which have been condensed as hereinafter set forth and will be considered seriatim, beginning with 5(b). Discussion on 5(a) and 5(h) will be reserved until the last.

### Reason 5(b)

The District Attorney of Dauphin County and a Special Deputy Attorney General of the Com-

monwealth of Pennsylvania intruded upon said investigating grand jury and illegally and erroneously instructed them on the law.

The Superior Court of Pennsylvania (Commonwealth v. Evans et al., 190 Pa. Super. 179, 198, 154 A.2d 57, 69) said:

"The allegation of intrusion by the district attorney and the special deputy attorney general is likewise extraneous to the indictments and is without merit.

" 'It is the duty of the district attorney * * * to attend upon a grand jury, lay before them all matters upon which they are to pass, aid them in the examination of witnesses and give general instructions as may be required. It is highly improper, however, for the district attorney * * * to take part in the deliberations of a grand jury, as it is their duty to consider alone the evidence and apply it to the case.' Com. v. Brownmiller, supra, 141 Pa. Superior Ct. 107, 113, 14 A.2d 907, 910. The record shows that the district attorney and the deputy attorney general properly attended upon the investigating grand jury giving only general advice. There was no improper conduct or intrusion upon its deliberations."

The Court there also said:

"A further consideration is that the investigating grand jury and the indicting grand jury are separate legal bodies. Although both may have considered the same alleged crimes involving the same individuals, their proceedings, deliberations, and presentments are distinct. Extraneous matters affecting one may not influence the other, and irregularities before one are not always present in the other; the two bodies are unrelated in this respect. Consequently, an indictment by a regular grand jury is not necessarily tainted by some irregularity or improper influence alleged to have affected the investigating grand jury. Com. v. Gross, supra, 172 Pa.Superior Ct. 85, 90, 91, 92 A.2d 251. At least, the irregularity or improper influence must be shown to have also affected the indicting grand jury. Nothing of this nature appears in this case. 'No matter how irregular the investigatory proceedings before the grand jury may have been, the presentment at least furnished the district attorney with information sufficient to justify his application for leave to present a district attorney's bill.' Com. v. Brownmiller, 137 Pa.Superior Ct. 261, 267, 9 A.2d 155, 158."

As an issue of fact, there was ample basis for the determination thus made by the Pennsylvania court. Moreover, the Court's discussion pinpoints the fact that petitioner is referring to the investigating grand jury, not the regular indicting grand jury. There was an indictment duly returned by a regular grand jury. There was an investigating grand jury serving a purpose under State practice somewhat akin to the preliminary hearing before a United States Commissioner in Federal practice for determination of probable cause. That no constitutional issue for consideration in habeas corpus is involved is forcefully demonstrated by Judge Parker's remark in Barber v. United States, 4 Cir., 142 F.2d 805, 807, that "The only purpose of a preliminary hearing is to determine whether there is sufficient evidence against an accused to warrant his being held for action by a grand jury; and, after a bill of indictment has been found, there is no occasion for such hearing."[1]

---

1. See also, Boone v. United States, 6 Cir., 1960, 280 F.2d 911; United States ex rel. Bogish v. Tees, 3 Cir., 1954, 211 F. 2d 69, 72; Yodock v. United States, D.C.M.D,Pa.1951, 97 F.Supp. 307, 310, affirmed 3 Cir., 196 F.2d 1018; Barrett v. United States, 8 Cir., 1959, 270 F. 2d 772; United States ex rel. Mulhollen v. Cavell, D.C.W.D.Pa.1959, 174 F.Supp. 923.

### Reason 5(c)

■ After presentments had been returned by the special investigating grand jury, the District Attorney of Dauphin County, without obtaining court approval as required by the law of Pennsylvania, presented indictments to the regular grand jury.

The Superior Court points out (Commonwealth v. Evans et al., 190 Pa.Super. 179, 199, 154 A.2d 57, 69) that "On January 21, 1957, the court entered an order that the district attorney 'prepare and submit to the regular January, 1957, Grand Jury now in sessions, bills of indictment covering all the matters contained in the Presentment of the Special Grand Jury of Investigation made to the Court on Friday, January 18, 1957.'" This is fully borne out by the record. It was held that this "was sufficient leave of court for submission of the indictments." Aside from any lack of merit in petitioner's contention, such determination of the State law was purely a matter for the State courts and involves no constitutional question which might be invoked in habeas corpus, Costello v. United States, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397; Knewel v. Egan, 268 U.S. 442, 45 S.Ct. 522, 69 L.Ed. 1036.

### Reason 5(d)

■ The indictment at No. 216 January Sessions 1957 charged petitioner and certain others with conspiracy to cheat and defraud the Pennsylvania Turnpike Commission.

The indictment at No. 220 January Sessions 1957 charged petitioner with misbehavior in office.

The Court consolidated the trial of said charges against petitioner and others, with the trial of certain officers of Manu-Mine Company upon charges of obtaining money by false pretense at No. 218 January Sessions 1957.

The consolidation of the trial upon said indictments was done over the objections of the petitioner and resulted in a trial lacking in due process.

On this matter the Superior Court of Pennsylvania stated, inter alia (190 Pa. Super. 179, 230, 154 A.2d 57, 84):

"Upon motion of the district attorney, to which the defendants objected, the court permitted the consolidation of the indictments for trial. The general rule is that the court in its discretion may consolidate two or more indictments for trial where the offenses charged are similar, related, or connected unless substantial prejudice will result to the accused. Com. v. Krzesniak, 180 Pa.Superior [Ct.] 560, 567, 119 A.2d 617. The consolidation of a conspiracy indictment with other related charges will normally not be disturbed where it appears the evidence that was admissible on the crimes charged in the other indictments tended to support the conspiracy charge. Com. v. Dixon, 179 Pa. Superior [Ct.] 1, 5, 115 A.2d 811. The consolidation for trial of indictments charging conspiracy and misdemeanor in office has been recognized. Com. v. Ackerman, supra, 176 Pa.Superior Ct. 80, 85, 106 A.2d 886. And, in general, defendants charged with conspiracy should be tried together. Com. v. Antico, 146 Pa.Superior [Ct.] 293, 311, 22 A.2d 204."

■ On the record this Court could not say that the trial court and the appellate courts of Pennsylvania erred in finding that petitioner was not prejudiced by a consolidation of the indictments for trial. However, even at best, this can rise no higher than a question of law involving the exercise of the trial court's discretion (Schaffer et al. v. United States, 362 U.S. 511, 80 S.Ct. 945, 4 L.Ed.2d 921) and does not encompass any due process issue for habeas corpus, Brandenburg v. Steele, 8 Cir., 177 F.2d 279. The mere fact that there has been unsuccessful recourse to appeal does not make habeas corpus available as a further appellate step, United States ex rel.

Saunders v. Myers, 3 Cir., 276 F.2d 790; Wilson v. Lanagan, D.C.Mass., 19 F.Supp. 870.

### Reason 5(e)

 The trial judge permitted the Commonwealth to read to the jury the lengthy transcript of the testimony before the grand jury of one of petitioner's co-defendants.

Petitioner seeks to assign numerous reasons why the admission at the trial of the testimony of a defendant, John D. Paul (which testimony was given before the investigating grand jury and contained references to the defendant Torrance) was error. Defendant Paul at no time during the trial took the stand to testify. The trial started June 4, 1957, and the Commonwealth rested on June 28, 1957. Paul's statement, that is his testimony before the investigating grand jury, which of course was after the termination of any conspiracy, was introduced in evidence and the reading to the trial jury of such statement began on June 27, 1957. The admissibility of this evidence was carefully considered in the proceedings on appeal in the State courts and dealt with, especially by the Superior Court, at some length. In 190 Pa.Super. 179, 244, 154 A.2d 57, 91, that Court said:

"Defendants allege that it was prejudicial error for the trial judge to admit into evidence the investigating grand jury testimony of John D. Paul, one of the defendants who was acquitted by the jury. The testimony was presented to the jury as an admission against Paul. The Commonwealth offered it against all defendants, but the trial judge was of the opinion that testimony given before the investigating grand jury was not in furtherance of the conspiracy and did not promote or advance the common unlawful object. Therefore, before the testimony was introduced, the jury was instructed that it was restricted to John D. Paul and was not to be considered against any of the other defendants. The testimony was lengthy. It is the contention of defendants that notwithstanding the fact that the trial judge instructed the jury that this testimony was to be considered as an admission against John D. Paul only, it nevertheless contained material which was so prejudicial to the other defendants as to have been improperly admitted. It is argued that such testimony of Paul was not admissible at all because it was not an admission but an attempt by Paul to exculpate himself while inculpating the other defendants; that those portions containing references to the other defendants should not have been read to the jury along with the admissions of Paul; and that the trial judge, although he gave cautionary instructions to the jury when the testimony was received and in the course of his charge, nevertheless improperly utilized the testimony to the prejudice of the other defendants in discussing their role in the conspiracy and fraud.

"The testimony of Paul was a detailed recitation of his knowledge of the functioning of the Turnpike Commission, particularly with reference to the Manu-Mine contract. As such it necessarily would involve statements concerning the other defendants. The testimony was certainly admissible against Paul. It contained admissions notwithstanding the fact that it was not an unqualified confession of guilt. 'An "admission" as applied to criminal cases has been defined as a "statement by defendant of a fact or facts pertinent to the issues, and tending, in connection with proof of other facts or circumstances, to prove the guilt, * * * but which is, of itself, insufficient to authorize conviction; it is a circumstance which requires the aid of further testimony to generate a reasonable conclusion of guilt." * * * Voluntary statements made by a defendant, although they may not amount to a confession of guilt, can be used against him if

they tend to explain issues on trial, * * *' Com. v. Elliott, 292 Pa. 16, 20, 140 A. 537, 538. Generally, where the Commonwealth desires to prove certain admissions of a defendant, it is not necessary to put in evidence his entire previous testimony. Com. v. House, 6 Pa.Superior [Ct.] 92, 104. But the entire testimony may be received as an admission where the defendant is charged with participation in a complicated criminal endeavor involving many related facts, incidents, and circumstances, most of which are set forth in the prior testimony. In such a case his entire testimony may be viewed as a whole to ascertain the full extent of defendant's admission as to his participation in the criminal plot. The testimony of Paul provided a thorough picture of this complicated conspiracy and his participation therein, whether innocent or guilty; it was properly admitted as a whole against him. The fact that the jury subsequently acquitted him does not retroactively affect the admissibility of his prior testimony. Com. v. Berman, supra, 119 Pa.Superior [Ct.] 315, 323, 326, 181 A. 244.

"In a joint trial the acts and declarations of a conspirator made after the conspiracy has ended are admissible against that defendant so long as the jury is properly instructed on the limited purpose and effect of the admissions. This is true notwithstanding that the admission may make reference to the other defendants. Such was the situation in Com. v. Berman, supra, 119 Pa.Superior [Ct.] 315, 329, 181 A. 244. We there stated (page 329 of 119 Pa.Superior [Ct.], page 249 of 181 A.): 'A statement by one of several codefendants which is in the nature of a confession is admissible in evidence under proper instructions, although such a statement may indirectly influence the minds of the jury against the other defendants on trial. * * * The mere fact that evidence legally admissible against one of several defendants may prejudice his codefendant, is no reason for its exclusion. * * * The Cummings statement set forth what he said he knew of the conspiracy charged, and his version of his connection with it. Such a voluntary statement by a defendant is admissible against him, although it may not contain an unqualified admission of guilt. * * * The statement by Cummings, that the scheme with which he was connected proved unfair and unethical and a scheme to defraud customers, was relevant and admissible, although he endeavored to impute the fraud to what he called the "Berman group." It might properly be inferred from his statement that he knew more about the scheme than he disclosed. The evidence being relevant, it was immaterial that the statement contained an expression of opinion by Cummings which might be detrimental to the appellant, a codefendant; and it was admissible if sufficiently limited by proper instructions.' See, also, Com. v. Dolan, 155 Pa.Superior [Ct.] 453, 458, 38 A.2d 497; United States v. Griffin, 3 Cir., 176 F.2d 727, 729, certiorari denied 338 U.S. 952, 70 S.Ct. 478, 94 L.Ed. 588.

"The contention that, at the time the admission was offered, there was not sufficient other evidence of the conspiracy is without merit. The admission was introduced almost at the end of the Commonwealth's case. There was sufficient proof of the conspiracy at that time. As said in Com. v. Zuern, 16 Pa.Superior [Ct.] 588, 604: 'The proof of the conspiracy at the point in the trial when the declarations are sought to be introduced, need not be conclusive, but only slight, in order to permit the introduction.'

"At the inception of the reading of the testimony of John D. Paul,

*the trial judge admonished the jury that 'this witness is about to be questioned concerning certain testimony alleged to have been given by one of the nine defendants in the conspiracy case, John D. Paul. The testimony you are about to hear, we emphasize, is restricted to John D. Paul, alone. It applies to him alone and to no other defendant. You will keep that in mind as the testimony is given, and that applies in all of the cases that are before you for trial.' This admonition was repeated later at the request of defense counsel. In the charge the trial judge instructed the jury on at least five occasions that the testimony of John D. Paul was restricted to him alone and was not to be considered against the other defendants. In addition, at the request of Evans in his points for charge, the trial judge reiterated the admonition on two occasions. We think the in-*structions were adequate. There was sufficient evidence presented to substantiate the conviction of the four remaining defendants, unaffected by the admission of the Paul testimony. We do not believe that the circumstances are such that the jury disregarded the admonitions of the trial judge. See Com. v. Fugmann, supra, 330 Pa. 4, 17–19, 198 A. 99; Com. v. Novak, 165 Pa.Superior [Ct.] 576, 581, 69 A.2d 186. The verdicts indicate otherwise." (Emphasis supplied.)

▇ Such determination on the admissibility of the evidence finds support in the record. As a question of law, it was likewise a matter for the State court. As was stated in Anderson v. Heinze, 9 Cir., 1958, 258 F.2d 479, 483:

"Yet, with one exception, Anderson does not now dispute the determination of the district court that the instant application advances no new ground. This is the most significant fact to be drawn from the papers before us. The one exception has to do with the contention that the trial court erred in permitting use, at the trial, of a transcript of the preliminary hearing. But, assuming that this is a new ground (which it is not), it is one which presents no federal question * *."

Nor is the State law on this matter of evidence at variance with Federal law, United States v. Griffin, 3 Cir., 176 F.2d 727; Delli Paoli v. United States, 352 U.S. 232, 77 S.Ct. 294, 1 L.Ed.2d 278; United States v. Gottfried et al., 2 Cir., 165 F.2d 360, 367. But to disagree with the State court's determination in a matter of this kind, even were we so inclined,[2] is not the function of this Court in habeas corpus. As was stated in United States ex rel. Saunders v. Myers, 3 Cir., 1960, 276 F.2d 790, 791:

"* * * what appellant seeks to have this court do is to pass on the admissibility of the testimony and, assuming we could determine that it should have been excluded, to weigh the sufficiency of the remaining evidence. We can do neither. With certain exceptions, see Sunal v. Large, 1947, 332 U.S. 174, 67 S.Ct. 1588, 91 L.Ed. 1982, none of which are present, admissibility and sufficiency of evidence are matters for appeal, not habeas corpus. (Cases cited). Because, as here, there has been unsuccessful recourse to appeal does not make habeas corpus available as a further appellate step. Federal courts may not promulgate rules of evidence for state courts under the guise of preserving due process. The record before us does not reveal that Saunders ' * * * has been dealt with with such a lack of fairness that we may say he has not been given due process of law.' (Cases cited.)"

Reasons 5(f) and (g)

▇ (f) The trial court allowed the prosecution to present five rebut-

---

**2.** See Judge Learned Hand's comment in United States v. Gottfried et al., supra.

tal witnesses to testify to their own conspiracies and crimes unrelated to the charges against petitioner, which testimony was intended to and served only to inflame and prejudice the jury.

(g) The trial court permitted witnesses to read to the jury statutes of the Commonwealth of Pennsylvania and to offer their interpretations and constructions thereof and in addition illegally restricted petitioner's right to cross-examine said witnesses.

As to these matters the State appellate court (190 Pa.Super. 179, at pages 235, 237, 238, and 239, 154 A.2d 57, at page 87) commented:

" * * * Another instance concerned the testimony of five Manu-Mine inspectors as to certain irregularities in the slushing program. This testimony, offered in rebuttal, was limited to contradicting certain defense witnesses. It was thoroughly and repeatedly explained to the jury that it was received solely for that limited purpose. We cannot see how Stickler and Landsidle were prejudiced under the circumstances. The instructions were adequate and clear. For the most part the evidence demonstrated the general course of conduct tending to the same general end. Com. v. Dixon, supra, 179 Pa.Superior [Ct.] 1, 5, 115 A.2d 811.

* * * * * *

"Defendants next allege certain errors in the admission of evidence.

"Defendants contend that the trial judge erred in permitting two witnesses to testify as to the law of Pennsylvania applicable to the commission and its power to contract. At the beginning of the trial, the Commonwealth called Harrington Adams, a deputy attorney general, who read into evidence section 4 of the Act of May 21, 1937, P.L. 774, No. 211, 36 PS § 652d, which created

the Pennsylvania Turnpike Commission and made it an instrumentality of the Commonwealth. Adams also read the provision in section 4 giving the commission the power to contract, with the proviso that contracts relating to construction shall be approved by the Department of Highways and that such construction be under the supervision of the Department of Highways. Adams then read into evidence the portions of the Act of September 27, 1951, P.L. 1430, as amended, 36 PS § 660.2, 660.6, which created the Northeastern Extension of the Pennsylvania Turnpike and gave the commission the power to contract for its construction subject to the same approval and supervision by the Department of Highways.

* * * * * *

"It is the general rule, as contended by defendants, that the trial judge, not expert witnesses, should give instructions to the jury on domestic law and its application to the case. Com. v. Giltinan, 64 Pa. 100, 105; Com. v. Walker, 178 Pa.Superior [Ct.] 522, 528, 116 A.2d 230. But we perceive no harmful effect in having the actual provisions of the law read into evidence, as here, from the pamphlet laws. Contrary to defense contentions, the witnesses, by reading the provisions to the jury, did not give an opinion or interpretation of the laws as applied to this case. * * *"

As the Court correctly noted, the rebuttal testimony clearly had reference to two other defendants and had no pertinency as to Torrance.

In Lisenba v. People of State of California, 314 U.S. 219, 62 S.Ct. 280, 86 L.Ed. 166, the extreme situation of a California State court sentence of death for a conviction for murder was involved and the attack was on the admission of a confession. Justice Roberts' observations (314 U.S. at pages 236, 238

and 239, 62 S.Ct. at page 290) are pertinent, namely:

"As applied to a criminal trial, denial of due process is the failure to observe that fundamental fairness essential to the very concept of justice. In order to declare a denial of it we must find that the absence of that fairness fatally infected the trial; the acts complained of must be of such quality as necessarily prevents a fair trial * * *.

\* \* \* \* \* \*

" * * * Furthermore, in passing on the petitioner's claim, the Supreme Court of the State found no violation of the Fourteenth Amendment. Our duty then is to determine whether the evidence requires that we set aside the finding of two courts and a jury and adjudge the admission of the confessions so fundamentally unfair, so contrary to the common concept of ordered liberty as to amount to a taking of life without due process of law.

\* \* \* \* \* \*

" * * * if federal power is invoked to set aside what California regards as a fair trial it must be plain that a federal right has been invaded."

■ The matters sought to be raised here are clearly within the realm of admissibility of evidence under State law of such a nature as to have no connotation of Federal constitutional involvement. What we are dealing with in this habeas corpus proceeding is not the innocence or guilt of Torrance but whether his constitutional rights were preserved, Moore v. Dempsey, 261 U.S. 86, 88, 43 S.Ct. 265, 67 L.Ed. 543. We do not have before us any of the exceptions, Sunal v. Large, 332 U.S. 174, 67 S.Ct. 1588, 91 L.Ed. 1982, to the general rule that this Court on a habeas corpus from a State conviction does not pass on the admissibility of the testimony or, assuming that it should have been excluded, to weigh the sufficiency of the remaining evidence, United States ex rel. Saunders

v. Myers, 3 Cir., 1960, 276 F.2d 790. The petitioner's guilt or innocence is for the State court and the jury that tried him and "The District Court may not, on a petition for habeas corpus, usurp the function of the state jury by determining, de novo, the innocence or guilt of a prisoner convicted under state process." United States ex rel. Helwig v. Maroney, 3 Cir., 271 F.2d 329, 332; United States ex rel. Mayo v. Burke, D.C.E.D.Pa., 23 F.Supp. 490, 495, affirmed 3 Cir., 185 F.2d 405, certiorari denied 341 U.S. 922, 71 S.Ct. 739, 95 L.Ed. 1355, rehearing denied 341 U.S. 943, 71 S.Ct. 995, 95 L.Ed. 1369; United States ex rel. Fletcher v. Cavell, D.C.W.D.Pa., 183 F.Supp. 335, 337.

### Reason 5(a)

■ That the Governor made inflammatory remarks on the evening of October 22, 1956, when the investigating grand jury was convened and thereafter which tended to prejudice the grand jury against the defendant.

In an opinion to No. 216 January Session of the Court of Quarter Sessions of Dauphin County, Pennsylvania (70 Dauph.Co.R. 197, 205, 206), Judge Neely dismissed motions to quash the indictment filed by the several defendants, including that filed by defendant Torrance. In answer to the above reason the Court said:

"The defendant complains that the Governor made an 'inflammatory and improper speech' over television in the Harrisburg area which prejudiced the Special Grand Jury. The speech did have a highly political flavor. It is set forth in the petition that the Governor's speech was delivered on October 22, 1956, the day the Grand Jury convened, and again on October 23. The Court charged the investigatory Grand Jury as follows:

" ' * * * These matters are being submitted to you for investigation at a time when partisanship runs high and in the midst of a

Presidential Election. The petition was so presented and the Court had no recourse except to submit the matter to you at this time. We instruct you, however, that you are to treat the convening of this Grand Jury and the current political campaign as a matter of pure coincidence.

" 'There has been wide publicity in the press and other media of communication concerning the investigation. We have mentioned this publicity at this time in our charge to emphasize the importance to you of divorcing your deliberations from political turmoil and clamor, and reaching your conclusions on the evidence submitted to you, uninfluenced by any partisanship or political considerations whatsoever.'

"We have no reason to believe that this Grand Jury disregarded this admonition because of these political speeches made at the very outset of their investigation and before they had received the great quantity of testimony that was submitted to them. The petition of the defendant on this aspect of the case is clearly based on 'allegations of extraneous factors,' and as stated in Commonwealth v. Gross, supra, 172 Pa.Super. Ct. 85, at page 92 [92 A.2d 251, at page 254], a Court should not sustain a motion to quash based upon such factors 'except in a clear case where it is convinced that harm has been done to the defendant.' We cannot reach the conclusion that such harm was done the defendant as to require the quashing of this indictment because of this political speech. We must bear in mind that the presentment recited the facts upon which the Grand Jury made their finding of probable cause, and the factual information was sufficient to justify the application for the District Attorney's bill: Commonwealth v. Brownmiller, et al., supra, 137 Pa.Super.Ct. 261, 267 [9 A.2d 155]."

The action of Judge Neely in refusing to quash the indictment for the reason, inter alia, above quoted, was approved by the Pennsylvania Superior Court (190 Pa.Super. 179, 196, 154 A.2d 57, 68) as follows:

"On October 22, 1956, upon the petition of the Attorney General of the Commonwealth, dated September 1, 1956, in which the District Attorney of Dauphin County had joined, a special investigating grand jury was convened. The matters disclosed by the presentment of the investigating grand jury formed the basis for the bills of indictment submitted, at the direction of the court, to the regular grand jury for the January Sessions of 1957. On January 23, 1957, the regular grand jury returned indictments against the nine defendants, five of whom have appealed after conviction, and four of whom were acquitted. Defendants moved to quash the indictments, alleging that on the evening that the investigating grand jury convened and on the following evening the Governor of the Commonwealth, in broadcasts over two Harrisburg television stations, made an inflammatory speech and remarks, and that the district attorney and the special deputy attorney general had intruded upon the deliberations of the investigating grand jury, which was prejudicial to defendants. The motions to quash were denied in an opinion by Judge Neely; we believe this was proper.

"It is significant that the motions to quash, with the exception of that filed by defendant Torrance, do not question the form or sufficiency of the indictments, and that the matters alleged as prejudicial are extraneous to the indictments and relate principally to the investigating grand jury and not to the indicting grand jury. Ordinarily, alleged defects or irregularities in the proceedings preliminary or antecedent to the indict-

ment may not be considered on a motion to quash. Com. v. Gross, 172 Pa.Superior [Ct.] 85, 92, 92 A.2d 251. A motion to quash which is based upon the allegation of extraneous factors should not be sustained unless it clearly appears that the defendant has been harmed by some improper conduct that interfered with his substantial rights. The court below concluded that the remarks of the Governor at the time the investigating grand jury convened were not such as to harm the defendants in the subsequent return of the indictments. In this respect the court considered not only the allegations' of defendants, but also the fact that the investigating grand jury was specifically admonished in the charge of the court to divorce its deliberations from any political turmoil, public clamor, or publicity, and to reach its conclusions on the basis of the evidence presented 'uninfluenced by any partisanship or political considerations whatsoever.' There is nothing to indicate that the investigating grand jury did not properly follow this instruction. Com. v. Brownmiller, 141 Pa.Superior Ct. 107, 113, 14 A.2d 907. Nor is there any indication that the grand jurors heard such irrelevant remarks. If they had it would not necessarily invalidate the subsequent indictments based upon other and proper evidence. Com. v. Gross, supra, 172 Pa.Superior [Ct.] 85, 92, 92 A.2d 251."

I agree with the Superior Court that the action of Judge Neely in denying the motion to quash the indictment was proper. The special investigating grand jury was convened October 22, 1956, and it was on this date that the alleged offending speech of the Governor of Pennsylvania was made. The presentment of the special grand jury of investigation was made to the Court on January 18, 1957. The regular grand jury returned the indictments on January 23, 1957. The trial began on June 4, 1957, approximately eight months after the Governor's speech.

In Reynolds v. United States, 98 U.S. 145, 155, 25 L.Ed. 244, the Court said:

" * * * Mr. Chief Justice Marshall, in Burr's Trial (1 Burr's Trial, 416), states the rule to be that 'light impressions, which may fairly be presumed to yield to the testimony that may be offered, which may leave the mind open to a fair consideration of the testimony, constitute no sufficient objection to a juror; but that those strong and deep impressions which close the mind against the testimony that may be offered in opposition to them, which will combat that testimony and resist its force, do constitute a sufficient objection to him.' The theory of the law is that a juror who has formed an opinion cannot be impartial. Every opinion which he may entertain need not necessarily have that effect. In these days of newspaper enterprise and universal education, every case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any one can be found among those best fitted for jurors who has not read or heard of it, and who has not some impression or some opinion in respect to its merits. It is clear, therefore, that upon the trial of the issue of fact raised by a challenge for such cause the court will practically be called upon to determine whether the nature and strength of the opinion formed are such as in law necessarily to raise the presumption of partiality. The question thus presented is one of mixed law and fact, and to be tried, as far as the facts are concerned, like any other issue of that character, upon the evidence. *The finding of the trial court upon that issue ought not to be set aside by a reviewing court, unless the error is manifest.* No less stringent rules should be applied by the reviewing

court in such a case than those which govern in the consideration of motions for new trial because the verdict is against the evidence. It must be made clearly to appear that upon the evidence the court ought to have found the juror had formed such an opinion that he could not in law be deemed impartial. The case must be one in which it is manifest the law left nothing to the 'conscience or discretion' of the court. (Emphasis supplied.)

"The challenge in this case most relied upon in the argument here is that of Charles Read. He was sworn on his *voire dire;* and his evidence, taken as a whole, shows that he 'believed' he had formed an opinion which he had never expressed, but which he did not think would influence his verdict on hearing the testimony. We cannot think this is such a manifestation of partiality as to leave nothing to the 'conscience or discretion' of the triers. The reading of the evidence leaves the impression that the juror had some hypothetical opinion about the case, but it falls short of raising a manifest presumption of partiality. In considering such questions in a reviewing court, we ought not to be unmindful of the fact we have so often observed in our experience, that jurors not unfrequently seek to excuse themselves on the ground of having formed an opinion, when, on examination, it turns out that no real disqualification exists. In such cases the manner of the juror while testifying is oftentimes more indicative of the real character of his opinion than his words. That is seen below, but cannot always be spread upon the record. Care should, therefore, be taken in the reviewing court not to reverse the ruling below upon such a question of fact, except in a clear case. The affirmative of the issue is upon the challenger. Unless he shows the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality, the juror need not necessarily be set aside, and it will not be error in the court to refuse to do so. Such a case, in our opinion, was not made out upon the challenge of Read. The fact that he had not expressed his opinion is important only as tending to show that he had not formed one which disqualified him. If a positive and decided opinion had been formed, he would have been incompetent even though it had not been expressed. * * *"

Petitioner in support of his petition has cited Irvin v. Dowd, 81 S.Ct. 1639, 1642. In my opinion the facts of the instant case bear no similarity to those in the Irvin case. However, in Irvin the Court citing the Reynolds case, supra, said:

"It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. *It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.* Spies v. People of State of Illinois, 123 U.S. 131 [8 S.Ct. 21, 31 L.Ed. 80]; Holt v. United States, 218 U.S. 245 [31 S.Ct. 2, 54 L.Ed. 1021]; Reynolds v. United States, supra. (Emphasis supplied.)

\* \* \* \* \* \*

"Here the 'pattern of deep and bitter prejudice' shown to be present

throughout the community, cf. Stroble v. State of California, 343 U.S. 181 [72 S.Ct. 599, 96 L.Ed. 872], was clearly reflected in the sum total of the voir dire examination of a majority of the jurors finally placed in the jury box. Eight out of the 12 thought petitioner was guilty. With such an opinion permeating their minds, it would be difficult to say that each could exclude this preconception of guilt from his deliberations * * *. *Two-thirds of the jurors had an opinion that petitioner was guilty and were familiar with the material facts and circumstances involved, including the fact that other murders were attributed to him, some going so far as to say that it would take evidence to overcome their belief. One said that he 'could not * * * give the defendant the benefit of the doubt that he is innocent.' Another stated that he had a 'somewhat' certain fixed opinion as to petitioner's guilt * * *.*" (Emphasis supplied.)

Although petitioner contends the remarks of the Governor had been widely disseminated in Dauphin County by press, television and radio, it is pertinent to note that at no time was the effect of these remarks upon the jury raised with particularity by the usual methods, such as a motion for change of venue, a challenge to the array, or by individual challenges for cause during selection of the petit jurors on voir dire.

In Stroble v. State of California, 1952, 343 U.S. 181, 194, 72 S.Ct. 599, 605, 96 L.Ed. 872, speaking for the Court, Justice Clark said:

"" * * * in an effort to determine whether there was public hysteria or widespread community prejudice against petitioner at the time of his trial, we think it significant that two deputy public defenders who were vigorous in petitioner's defense throughout the trial, saw no occasion to seek a transfer of the action to another county on the ground that prejudicial newspaper accounts had made it impossible for petitioner to obtain a fair trial in the Superior Court of Los Angeles County."

It is equally significant in the instant case that with sixteen counsel of record for the defendants none of them thought the matter of sufficient consequence or importance to raise it at the appropriate time. If petitioner deemed the matter of sufficient importance, he could not sit idly by and fail to raise it at the proper time on a gamble on the verdict and then being dissatisfied with the verdict, vociferously assert a deprivation of due process.

A careful reading of the entire transcript covering the voir dire examination of prospective jurors disclosed only a very cursory reference to the Governor's speech. This examination certainly does not disclose that any juror had formed "strong and deep impressions which close the mind against the testimony that may be offered in opposition to them." [3] The trial court certainly was justified in concluding that

3. As to the total lack of any evidence of the bias or prejudice claimed by the petitioner, the following summary of the attitudes of the twelve jurors selected is pertinent:

Juror No. 1. This juror indicated he could return a verdict based on the evidence and the instructions of the Court and nothing else. He read "the headline in the paper," that was all he had "seen about the Turnpike case."

Juror No. 2.

"Q. Does it mean anything to you? Have you read about it or have you heard it discussed in any way at all directly or indirectly? A. No, I hadn't. I wasn't even following that.

"Q. Do you know there was such a case? A. I heard of a case like that in the paper and so forth. I hadn't read too much because I wasn't interested too much in it.

"Q. You have never discussed it with anyone? A. No."

Juror No. 3.

"Q. Where did you hear about it? A. Oh, little dribdrabs here and there, then

all of the jurors selected would lay aside any impression or opinion he may have entertained (and incidentally the record is devoid of any suggestion that any juror had formed any opinion) and render a verdict based on the evidence produced in Court.

### Reason 5(h)

Petitioner states that "the trial judge failed to strive for an

I read here and there pieces. I don't remember too much about it, * * *.

"Q. Did you have occasion, sir, to discuss it with anyone, any of your friends or other people? A. No. No. I just passed it by as another thing to read, something in the headlines. * * * I haven't read enough to form an opinion."

Juror No. 4.

"Q. This is one of the so-called Turnpike cases. Have you discussed this case with anyone? A. No, I have not.

"Q. Have you heard it discussed in your presence? A. No, I have not.

"Q. Have you formed or expressed any opinion as to the guilt or innocence of the following defendants—A. No, I have not. * * *

"Q. Did you engage in the discussion? A. No, I didn't know anything about it.

"Q. Have you any opinion at the present time concerning the guilt or innocence — A. I have not."

Juror No. 5.

"Q. Have you formed any opinion as to the guilt or innocence of any of these gentlemen? A. No, I have not.

"Q. If you were selected as a juror in this case, do you know of any reason why you could not take your place with the other jurors, listen to the testimony from the witnesses and His Honor's charge, and find a fair verdict between the Commonwealth and these defendants? A. No, I don't see any reason why I couldn't. * * *

"A. I have read about it, not too much, and I haven't discussed it with anyone.

"Q. From what you have read, have you formed any opinion as to the guilt or innocence of any of the parties? A. Well, not exactly. I was thinking about it. * * *

"Q. * * * while you say you could put this opinion aside, yet you also agree that it would take some evidence in order to overcome the opinion previously formed, is that correct? A. Well, I would have to hear the evidence, yes.

"Q. Would you have to hear some evidence from the defendants to overcome this opinion which you had formed? A. From the defendants? No, I don't think so."

Juror No. 6.

"A. No, I didn't read nothing about it."

Juror No. 7.

"Q. This is one of the so-called Turnpike cases. Now, I ask you, have you read about this case? A. Not too much.

"Q. In the newspaper? A. Very little.

"Q. Have you discussed it with anyone? A. No, sir.

"Q. Have you heard it discussed in your presence? A. No. * * *

"A. I knew there was an investigation, that it would be tried, but I had no idea when.

"Q. In what manner did that information come to your attention? A. Oh, just possibly by headlines. * * *

"A. Headlines in the paper, that is the only way. * * *

"Q. You have no opinion at the present time? A. None, at all, because I never read it in detail."

Juror No. 8.

"Q. * * *, this is one of the so-called Pennsylvania Turnpike cases. A. Yes.

"Q. Have you read about it in the newspaper? A. Well, very little.

"Q. Have you discussed it with anyone? A. No.

"Q. Has it been discussed in your presence? A. No.

"Q. Have you formed or expressed any opinion as to the guilt or innocence of any of the following named gentlemen— A. I have not, because I don't know that much about it. * * *

"Q. You have, have you not, some knowledge of this case? A. Very little.

"Q. What little you have was obtained from what source? A. It came from a headline in the paper."

Juror No. 9.

"Q. Have you formed and expressed any opinion in these cases which are known as the Turnpike cases? A. No, I didn't.

"Q. Have you heard the cases discussed at all? A. No."

Juror No. 10.

"Q. Have you read anything about this in the public press? A. No, sir, just headlines that meet the eye, that is all.

"Q. Have you discussed it with anyone; I am speaking now of the case we are talking about? A. No. * * *

"Q. I am talking about the radio and television. I asked you whether you

atmosphere of impartiality, but on the contrary gave the appearance of acting, and in fact acted as a member of the prosecution team."

As to this charge the Superior Court (190 Pa.Super. 179, 267, 154 A.2d 57, 102) said:

"* * * A reading of the entire record discloses no basic unfairness, bias, or prejudice in the admission or restriction of evidence, the examination and cross-examination of witnesses, or the attitude of the court toward defendants. The attitude of the trial judge in his rulings, in permitting the presentation of evidence, in the cross-examination of witnesses, as it can be gathered from the printed record, was equally fair to both sides. We point specifically to the wide latitude permitted defense counsel in cross-examining such witnesses as Lawler and Summers. We note that each of the counsel for the nine defendants on trial were given full and separate opportunity to cross-examine witnesses and present evidence. *De-*

*fense counsel were also permitted to cross-examine the defendant Torrance and to elicit from him by leading questions much favorable evidence.* Certainly in a trial of this nature and length there may be some errors of minor consequence; we find no reversible error. That the jury reached its conclusion without bias or prejudice from the conduct of the trial is indicated in some degree by the fact that four of the defendants in this joint trial were acquitted * * *. The myriad minor items enumerated in the briefs of defendants in connection with the attack upon the over-all conduct of the proceedings neither singly nor collectively demonstrate any basic unfairness. (Emphasis supplied.)

* * * * *

"We conclude this opinion by referring to one other allegation of the defendants to the effect that the trial judge was biased and unfair. This is devoid of merit. As a matter of fact, under the circumstances he

---

heard it discussed on television or on the radio? A. No, sir."

Juror No. 11.

"Q. You have heard of these cases? A. Yes, I have heard of them.

"Q. Have you read about them? A. Not too much.

"Q. Have you read to some extent about them? A. Some extent, but I formed no opinion. * * *

"Q. Whatever information you have about this case was obtained from what source? A. The only thing that I know anything at all about is what I have read in the paper.

"Q. In the newspapers? A. Yes, and that was very little."

Juror No. 12.

"Q. * * *, this is one of the so-called Turnpike cases, and I ask you now these questions: Have you discussed them with anybody? A. No.

"Q. Have you heard it discussed in your presence? A. No, I didn't.

"Q. Have you formed or expressed any opinion as to the guilt or innocence of any of the following gentlemen: * * * — A. No. * * *

"Q. Whatever information you may have on this case was acquired from what source, sir? A. Well, all the information I have was the little I read in the paper about it. That is about it. I wasn't interested and I didn't read much of it. About the headlines, that was all.

"Q. I take it you have not been asked and you did not discuss it with anyone? A. No. * * *

"Q. Do you have a completely unbiased mind regarding this case? A. Yes, sir."

The total number of jurors examined was twenty-six and as to those who were excused for cause or on peremptory challenge, the answers were generally similar to those above; the cause for excuse being such matters as deafness, acquaintship with some of the parties involved, and the inability to read. Only one juror who was examined and was then excused for cause indicated as follows:

"A. I read a little in the paper, that's all.

"Q. From what you have read have you formed any opinion— * * * A. I have an opinion, yes. * * *

"Q. Would it require evidence to change that opinion? A. Yes, sir."

displayed unusual self-control and forbearance. There were lengthy and repetitious objections by fourteen defense counsel during the trial, and at its conclusion, in support of their motions, they assigned 941 reasons and 221 additional reasons incorporated by reference. In the record of 6,500 pages we find no justification for the criticisms by defendants of the conduct of the trial judge. It is our conclusion that defendants had a fair and impartial trial, and that there was no violation of due process of law."

With this appraisal of Judge Kreider's conduct of the trial, I am in complete accord. The complexity of the issues, the number of defendants and their attorneys, and the time consumed, obviously made this a most difficult case to try. I cannot see how it would be humanly possible for any judge under the circumstances of this case to more nearly approximate assuring a fair and impartial trial to all parties concerned, namely, the Commonwealth, nine defendants and the nineteen attorneys. I feel that this reason is completely without merit.

Two oral arguments were heard by this Court in this matter, the first on a motion for a restraining order preventing petitioner's commitment to prison (Civil Action No. 7156) and the second on the instant petition. The Court was furnished a complete transcript of the trial of the case, including the examination of the prospective jurors on their voir dire. The transcript covered approximately 7,000 pages. Counsel for petitioner and for the Commonwealth were requested by the Court to indicate such portions of the testimony as they felt had a bearing on this petition, and this was all read. The entire testimony covering the examination of the prospective jurors was read. The opinions of the trial court and all of the appellate opinions were read.

This is a habeas corpus proceeding,—it is not an appeal. Our concern here is whether in his trial resulting in his conviction and the judgment and commitment thereon he was denied the due process of law and the equal protection of the laws guaranteed by the Fourteenth Amendment to the Constitution of the United States. My conclusion is that he was not.

The petition for writ of habeas corpus will be denied.